MERCANTILE TRUST COMPANY NA-TIONAL ASSOCIATION and Mary Anne O'Brien as Co-Trustees Under the Last Will and Testament of Jacob L. Babler, Deceased, Plaintiffs-Respondents,

v.

Joseph JAEGER, Jr., Director of Parks of the State of Missouri, Conn C. Winfrey, Member and Chairman of the Missouri State Park Board, Charles Tye Evans, Robert M. Wolpers, Carter V. Blanton, Hubert E. Lay, and Gerald B. Rowan, Members of the Missouri State Park Board, William E. Robinson, Treasurer of the State of Missouri, John C. Danforth, Attorney General of the State of Missouri, Defendants-Appellants.

STATE of Missouri ex rel. John C. DAN-FORTH, Attorney General, Plaintiff-Appellant,

v.

MERCANTILE TRUST COMPANY NA-TIONAL ASSOCIATION, a Corporation, and Mary Anne O'Brien, Co-Trustees of the Testamentary Trust Under the Will of Jacob L. Babler, Deceased, Defendants-Respondents.

No. 54395.

Supreme Court of Missouri, En Banc.

Aug. 3, 1970.

Rehearings Denied Sept. 14, 1970.

Thompson, Mitchell, Douglas, Neill & Guerri, James M. Douglas, William G. Guerri, Richard W. Metz, Lawrence E. Young, St. Louis, for respondent, Mercantile Trust Company National Association.

John Grossman, St. Louis, for respondent Mary Anne O'Brien.

Aubuchon & Walsh, Eugene P. Walsh, St. Louis, for Joseph Jaeger, Jr., Director of Parks of the State of Missouri; Conn C. Winfrey, Member and Chairman of the Missouri State Park Board; Charles Tye Evans, Robert M. Wolpers, Carter V. Blan-

ton, Hubert E. Lay and Gerald B. Rowan, Members of the Missouri State Park Board.

John C. Danforth, Atty. Gen., of Missouri, Louren R. Wood, Asst. Atty. Gen., of Missouri, Jefferson City, for William H. Robinson, Treasurer of the State of Missouri, and John C. Danforth, Attorney General of the State of Missouri.

HOLMAN, Judge.

At the termination of the testamentary trust established by the will of Jacob L. Babler, deceased, a dispute arose between the co-trustees of the trust estate and the Attorney General, representing the State of Missouri (beneficiary of the trust), with respect to the amount of compensation due the trustees. On July 7, 1966, the trustees filed a declaratory judgment suit seeking an adjudication of the disputed question, and later the same day the Attorney General filed a similar suit for the same purpose. The cases were consolidated and tried with the result that a judgment was entered specifying that the trustees were entitled to $190,730 additional compensation. Attorneys fees and expenses were also allowed in the total sum of $26,173.52. The appropriate representatives of the State of Missouri have duly appealed.

This appeal was originally heard in Division One where an opinion was adopted but the case was subsequently transferred to Court en Banc because of the dissent of one of the judges. Additional briefs were filed and the cause was re-argued and resubmitted. The Division opinion failed of adoption en Banc and the cause was assigned to the undersigned. Portions of the statement of facts in the aforementioned opinion are here adopted without the use of quotation marks.

The will of Jacob L. Babler, after providing for the payment of his debts, funeral expenses, etc., and for numerous specific bequests, left the remainder of his estate to two individuals, his brother Henry and one

Richard J. Weidert, in trust for the use and benefit of the Dr. Edmund A. Babler Memorial State Park in St. Louis County. The trustees were given broad investment and managerial powers in handling the trust estate.

In Item Fifteen, after reciting that he had deeded several hundred acres of land to the state as a public park and after expressing the purpose and use of the trust (to assist the state in maintaining, beautifying, further developing, and perhaps enlarging the park), testator continued as follows:

"After paying compensation to themselves as herein provided, and all other charges and expenses incident to the administration of the trust estate, the Trustees, or the survivor of them, are hereby authorized to use and expend all or any part of the 'net' income and revenue derived from said trust estate and not to exceed seven percent (7%) of the annual book value of the then corpus of said trust estate, for such general improvements, or projects of a recreational nature in the 'DR. EDMUND A. BABLER MEMORIAL STATE PARK,' as in the opinion and discretion of the Trustees, or the survivor of them, seems advisable under the then existing circumstances; it being understood, however, that any net earnings not used and expended for the purposes aforesaid, during the current year, shall, at the end of the year, be added to and become a part of the corpus of the trust estate. Should the Trustees, or the survivor of them, not withdraw and expend the full seven percent (7%) of the corpus of the trust estate in any year, then the unused portion of said seven percent (7%) for that year shall be cumulative and may be used the following, or any subsequent year or years."

Item Sixteen provided:

"This trust shall continue and endure for twenty (20) years, from and after the date of my death. On the twentieth anniversary, or as soon thereafter as practical, following the date of my death, I direct that the trust herein created shall cease and

terminate, and the entire remainder of the trust estate then in the hands of my trustees, or the survivor of them, both corpus and unused income and revenue, shall forthwith on receipt thereof, be paid over, transferred and conveyed to the then Treasurer or Acting Treasurer of The State of Missouri, to be used and expended under his supervision by the then State Park Authority, exclusively for the maintenance, beautification, further development and possible enlargement of the 'DR. EDMUND A. BABLER MEMORIAL STATE PARK.' "

Item Seventeen provided:

"I direct that during the administration of my estate in the Probate Court, and during the duration of the trust herein created, the trustees shall not engage the services of anyone in any way related to them, or the survivor of them.

"The Trustees shall receive as compensation for their services hereunder, seven percent (7%) of all disbursements of income and corpus made by them, to be divided equally between them. Should the services of either, or both Trustees be terminated during the course of any year, by death, resignation or incapacity, such retiring Trustee shall receive a pro-rata part of that year's compensation, based on the months of service rendered, it being understood that a fractional month shall be considered as a full month."

Provisions were made for the substitution of trustees in case of failure to act, incapacity, death, or resignation, and for alternate trustees. Mr. Weidert declined to act and the corporate trustee took his place. During the course of the administration Henry J. Babler died and Mary Anne O'Brien was substituted in his place. Item Twenty-Five designated Mr. Babler and Mr. Weidert, the named trustees, as executors and fixed as compensation for their services as executors "a fee of two percent (2%), instead of the regular statutory fee of five percent (5%) on all personal property and on money arising from the sale of real estate. Inasmuch as the Executors herein appointed are also named Trustees of the trust fund herein created, I feel that the two percent (2%) herein authorized as Executors' fees, is fair and reasonable."

The will was executed in July 1942. Testator died on May 31, 1945. The first regular analysis of the assets of the trust (in 1948) revealed a valuation of $760,000. At termination of the trust on May 31, 1965, the value of the trust estate, corpus, and unexpended income was $2,724,714.27. During the course of the 20-year administration approximately $800,000 was expended from income and principal for park purposes. A part of that sum was taken from corpus. The exact percentage was not shown. The average yearly gross income of the estate was $38,000. The average market value of the entire trust during the 20-year period was $1,396,000. During the 20-year period the trustees took commissions, from time to time, in the sum of 7% of the expenditures, totaling $56,066.54, of which Mercantile received $28,033.27 and the individual co-trustees received $28,033.-27. After May 31, 1965, the trustees credited themselves with commissions in the sum of $95,365 each, or a total of $190,730. Commissions paid by the trustees to themselves or reserved thus totaled $123,398.27 each.

Testator, a lawyer by profession, did not practice law. He devoted his time to his philanthropies, investments, and private business affairs. He prepared his own documents, deeds, notes, leases, etc. over a period of many years. Meticulous in the preparation of his will, he caused a lawyer of his acquaintance to conduct research on various phases of the problems involved, consulted at length with the lawyer, and had him submit proposed drafts of various provisions of the document. The preparation of the will took several months. During that time he counseled with at least a dozen outstanding persons, including a circuit judge, the state attorney general, several lawyers of wide experience, experts in the field of wills and trusts, and a number of

distinguished conservationists, including the Secretary of the Interior, the Director of the National Park Service, and the head of the State Park Board. The preliminary drafts numbered four before testator was satisfied with the final draft. He personally dictated the will, including the punctuation. He carefully chose his trustees from persons in whom he had special confidence, and in detailed fashion provided for successor or alternative trustees in various contingencies. He took pains to limit the type of securities in which the trustees were permitted to invest and cautiously provided that loans on real estate not exceed in amount 50% of the cash value of the security. He prohibited the trustees from directly or indirectly profiting personally from the trust administration, except for the compensation provided for them. He cautioned his trustees to have a written contract for any legal services required and to make specific arrangements as to fees and compensation with attorneys, admonishing that "under no circumstances, should attorneys be engaged without a definite written understanding, made in advance, as to what their charges will be."

After the suits were filed it was stipulated by the parties that the trustees would retain the amount of the disputed compensation during the pendency of the litigation but would proceed to pay over and transfer to the State Treasurer the remainder of the trust assets. It was further stipulated, however, that the Treasurer would set up a separate fund of $50,000 as a reserve against attorney fees, expenses, and court costs that might be allowed against the trust.

At the trial the defendants offered in evidence, and the court admitted, the schedule of fees of Mercantile in effect at the time Mr. Babler's will was written. It provided that in testamentary trusts the trustees' commission is five percent on income "as and when distributed" and five percent "on the market value of the principal of the trust estate, including real estate, whenever the same is distributed by the trustees."

Our main task on this appeal is to determine the meaning of the following part of Item Seventeen of the will: "The Trustees shall receive as compensation for their services hereunder, seven percent (7%) of all disbursements of income and corpus made by them, to be divided equally between them." The specific issue presented is whether the trustees are entitled to a commission of 7% of the corpus of the trust at the termination thereof. All parties attach considerable significance to the meaning of the word "disbursements" as used in that part of the will. In that connection the trial court made specific findings that "the word 'disbursements', in ordinary usage and as used in Item Seventeen of the will of Jacob L. Babler, deceased, includes the conveyance, transfer and distribution of trust corpus to remaindermen upon termination of a trust. In using the word 'disbursement' in Item Seventeen of his will, Jacob L. Babler intended that term to include property transferred to the beneficiary, the Treasurer of the State of Missouri, on termination of the trust. The term 'disbursement' as used in Item Seventeen of the will of Jacob L. Babler, deceased, is not restricted to sums paid from the funds of the estate in the nature of expenses and expenditures in its preservation, management and conduct, but it also includes moneys or funds or property of any kind paid over to the person entitled to the estate, the Treasurer of the State of Missouri, on termination of the trust. The proper meaning and construction of the will of Jacob L. Babler, deceased, is that the plaintiffs, Mercantile Trust Company National Association and Mary Anne O'Brien, as Co-Trustees, were entitled to receive and are entitled to retain from the trust assets and to divide equally between them the sum of $190,730.00 as compensation for their services as such Co-Trustees, said sum being seven percent (7%) of $2,724,714.27, the value of the trust assets upon termination of the trust on May 31, 1965."

In Commerce Trust Co. v. Weed, Mo. Sup., 318 S.W.2d 289 l.c. 294, we said that "[i]n the construction of wills our pri-

mary duty is to determine 'the true intent and meaning of the testator.' [§ 474.430 RSMo 1949, V.A.M.S.] All technical rules of construction are subservient to the paramount rule that the intention of the testator shall control unless it violates some established rule of law. Legg v. Wagner, Mo.Sup., 155 S.W.2d 146. In performing our task we must consider the will as a whole and not give undue preference to any particular clause. 'When the intent of the testator is found, the proper construction of the will is solved.' McMillan v. Barnard Free Skin & Cancer Hospital, 304 Mo. 635, 264 S.W. 410, 413. Moreover, we are mindful that 'The infinite variety of expressions and the differing shades of meaning so often attached to identical words or phrases when employed by the makers of wills in a context and under circumstances peculiar to the context of the will of each testator and the circumstances under which it was written make prior decisions construing similar words or phrases of far less value as precedent than those of other fields of litigated controversies.' Hereford v. Unknown Heirs, etc., 365 Mo. 1048, 292 S.W.2d 289, 293." In ascertaining the intent of the testator this court should, as nearly as possible, put itself in the position of testator and view the situation from his standpoint. And, we should recognize the "fundamental rule of construction that words used by the testator are to be understood in their ordinary sense, unless a different meaning is indicated by the context of the will, or by the circumstances of the case." Obetz v. Boatmen's Nat. Bank of St. Louis, 361 Mo. 221, 234 S.W.2d 618, 622.

Appellants contend that the proper construction of Item Seventeen is that the compensation of the trustees was provided on an annual basis only and that they were entitled to an annual commission of 7% on all disbursements of income and corpus made during the year; that they are not entitled to a commission on the corpus at the time the trust is terminated and its assets paid over to the State Treasurer; that

if testator had intended such compensation he would have specifically so stated or, at least, would have used the word "distribution" which indicates the transfer of assets at termination. They state that this is a case of first impression in this state and perhaps in the nation. In final analysis they rely entirely upon the provisions of the will (rather than decided cases) to support their contentions.

For reasons hereinafter stated we have concluded that the findings of the trial court were correct and that testator intended that the trustees should receive a commission of 7% on the value of the trust assets at the time of the termination of the trust.

It is true that the word "distribution" is generally used in designating the payment or delivery of assets at the termination of probate estates because that has long been the word used in the statutes relating to those estates. However, the word "disbursement" is a more general word and includes distribution. We find the definition of these words and their use in the cases to be helpful as indicating that testator may thereby have been familiar with such meaning when he wrote his will.

The word "disburse" is defined in Webster's Third New International Dictionary as "to expend * * * pay out * * * distribute." Substantially the same definition appears in the Second Edition of that work. In 26A C.J.S. pp. 967, 968, "disburse" is defined as follows: "In its general usage, the word usually has reference to the paying out or the expending of moneys or currency. In a particular connection, it has been held that the term is not restricted to sums paid from the funds of an estate in the nature of expenses and expenditures in its preservation, management, and conduct, but that it also includes moneys or funds or property of any kind paid over to the person entitled to the estate * * *." We also find that the word "distribute" is not always used in the cases in referring to the paying out of funds at the termination

of a trust or probate estate. In the following cases the word "disburse" is used in describing the transfer of remaining assets at the termination of both trust and probate estates: Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S.W. 744 [12]; In re McKinney's Estate, 351 Mo. 718, 173 S.W. 2d 898 [6]; In re Shelton's Estate, 338 Mo. 1000, 93 S.W.2d 684; Estey v. Commerce Trust Co., 333 Mo. 977, 64 S.W.2d 608 [10], and Vorderstrasse's Estate v. Haumueller, Mo.App., 266 S.W. 1019 [1]. It is reasonable to assume that testator, a lawyer particularly interested in probate and trust law, was familiar with that use of the word "disburse." In that connection, see also In re Gallen, D.C., 18 F.Supp. 683. In considering testator's concept of the meaning of the words "disburse" and "distribution" we think it is significant that in Item Sixteen of the will, in providing for disposition of the assets at termination, he did not use the word "distribute" but stated that the remainder of the estate should be "paid over, transferred and conveyed." It is also significant that in Item Fifteen, in dealing with the duties of the trustees in regard to the use of the income and a possible percentage of the corpus for maintenance and development of the park, the testator repeatedly used the phrase "use and expend." This would tend to indicate that when he later used the word "disbursements" in relation to trustees' commission he intended it to be a broader, more inclusive word than "expend."

We are also impressed by the fact that testator provided for a commission of only 2%, instead of the statutory 5%, for his executors because of the fact that they had also been named as trustees of the trust estate. That would indicate that he considered that he had provided for generous compensation for the trustees. Seven percent of the annual expenditures and of the corpus on termination is a generous commission, as indicated by the fact that the Mercantile schedule provided for a five percent commission. If appellants' contentions are correct the total compensation would have been an average of $1,400 per year for each trustee. When we consider the size of the trust estate, and the fact that it included many items of real estate located in a number of states, that amount would certainly not appear to be generous compensation. These facts would indicate that testator did not intend that the compensation be so limited.

Although testator undoubtedly had great confidence in the trustees he named, both primary and contingent, he nevertheless, being a careful and cautious man, made numerous provisions to govern their conduct and to avoid any actions on their part which would have been detrimental to the estate. He provided in detail the type of investments they were authorized to make; he specified that they should not "receive any profit to themselves, either directly or indirectly, in connection with the administration of the trust estate, except the compensation hereinafter provided for them"; that they should not purchase securities from themselves or in any other manner by which they might profit; that they should not employ anyone related to them; that if Miss O'Brien became a successor co-trustee she should cease to draw other compensation (apparently for stenographic services) from the estate; and also set out in detail the method to be used in employing attorneys. As heretofore indicated, the will provided a method by which the trustees could have expended all of the trust corpus during the existence of the trust. If, as appellants contend, testator intended that the only commission the trustees would receive was on annual expenditures of income and corpus, he surely would have anticipated that the trustees might be tempted to make unnecessary or lavish expenditures of corpus in order to increase their compensation. In that event, certainly this careful man would have included some specific provision by which he would have at least made an attempt to safeguard against that contingency. The fact he did not indicates to us that he did not intend to so limit the compensation.

It should again be noted that testator plainly provided that the trustees should receive as compensation "seven percent of all disbursements of income and corpus." We recognize, however, as contended by appellants, that it would be possible to conclude that such referred only to annual expenditures since the trustees were authorized to use a part of the corpus each year. It is our view, however, that the word "disbursements" is so broad and general that in ordinary usage, and as used here, it would be intended and understood to include the transfer of the corpus of the trust estate on termination.

We think that a very convincing factor bearing on the testator's intention is the fact that there existed in the St. Louis area a general custom (where the instrument creating the trust did not provide to the contrary) that trustees would receive as compensation a percentage of the corpus upon termination of the trust. That payment is not merely to compensate for paying out the assets but is in part delayed compensation for prior services during the existence of the trust. These facts are shown in part by Mercantile's Schedule of compensation, and were also conceded by appellants' counsel at the time of oral argument. This custom is in accord with the general rule. See Scott on Trusts, wherein it is said that "[t]he ordinary practice with reference to the compensation of trustees is to give the trustee annual or periodic commissions based on a percentage of the income received and paid out. This is paid from income. In addition they are entitled ordinarily to a percentage of the principal, payable on the distribution of principal," Vol. III, § 233.3, p. 1921, and 90 C.J.S. Trusts § 400 b, p. 734, wherein it is stated that "[a]s a general rule a trustee is entitled to a reasonable allowance on the corpus of the trust as to which their fiduciary duties have terminated." Testator, having a tremendous interest in the subject of trusts, was undoubtedly aware of the existence of that custom and had he not intended that his trustees receive a commission on the entire corpus on termination we think he would have definitely stated that they should not receive such a commission and thus would have prevented any doubt concerning the matter.

As heretofore indicated, we rule that the testator intended that the trustees receive a commission on the entire corpus of the trust estate upon its termination and that the findings and judgment of the trial court in that regard were correct.

The attorneys for the trustees filed applications for the allowance of attorney fees and expenses. These were heard and sustained. The trial court allowed the firm representing Mercantile the sum of $16,500 for legal services and $173.52 for expenses. The attorney for Miss O'Brien was allowed $9,500. The appellants contend that the trial court erred in making the allowances because the services rendered were for the personal benefit of the trustees and not for the benefit of the trust estate. We will not set out the evidence presented because the appellants do not question the amount of the allowances.

No case has been cited which involves the precise situation here presented. The rules involved are well settled, but the difficulty arises in applying the appropriate rule to the facts. In Jesser v. Mayfair Hotel, Inc., Mo.Sup., 360 S.W.2d 652, 658–659, it is stated that "[w]here ambiguity exists in a trust instrument resulting in a legitimate controversy as to the proper distribution of the trust fund or administration of the trust, the party instituting an action to construe the instrument is entitled to his fees and expenses even though he may benefit personally by the outcome of the litigation. Hereford v. Unknown Heirs, Mo.App., 306 S.W.2d 648, 650; Coates v. Coates, Mo.App., 316 S.W.2d 875, 878 [2]; Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157. See also Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W. 2d 833, 936 [61]. The plaintiffs' interests as beneficiaries in the fund did not disqualify them from having their attorneys' fees and expenses allowed."

The rule is stated in somewhat different language in Coates v. Coates, Mo.App., 316 S.W.2d 875, 877, 878, as follows: "It is a well-settled doctrine of equity that a trust fund should bear the expense of its own administration. In conformity with this doctrine it is the general rule that where doubt arises as to the true or proper construction of an instrument by which a trust is created and there are different claimants, the trustee may bring a proper action, such as for a declaratory judgment, setting forth the facts * * * and praying the order of the court in regard to the correct construction of the trust instrument and its proper execution. In such cases the expenses of the litigation * * * are properly charged upon the fund. The litigation is regarded as indispensable to the proper administration of the fund, it being necessary that all persons having interests therein or making claims thereto should be made parties, and * * * their several rights and claims be judicially determined and set at rest." See also Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104 [1]; St. Louis Union Trust Co. v. Kaltenbach, 353 Mo. 1114, 186 S.W.2d 578 [14, 15]; Kingston v. St. Louis Union Trust Co., 348 Mo. 448, 154 S.W.2d 39 [7], and Lang v. Taussig, Mo.App., 194 S.W.2d 743 [2, 8]. We think it is also a fair conclusion, from a reading of the cases, that courts of equity are more inclined to allow attorney fees to trustees than for individual claimants. And, the case of Hereford v. Unknown Heirs, Mo.App., 306 S.W.2d 648, indicates that courts are more inclined to allow attorney fees in cases involving wills creating trust estates than in suits involving an ordinary will construction.

We have concluded that the court properly allowed attorney fees and expenses in this case. The suit was filed after the parties had arrived at an impasse in the dispute over the issue we have heretofore decided. The trustees were contending they were entitled to a commission on the corpus at termination. The State Treasurer contended otherwise and was refusing to accept the transfer of the trust property unless all the assets (including the $190,730 in dispute) were delivered to him. In that situation the trust estate could not be finally terminated and the assets delivered to the State Treasurer until this question was determined by the courts. It was therefore reasonable and, in fact, essential that the suit be filed. That the trustees had a reasonable basis for making their claim would seem to be demonstrated by the fact that the trial judge and this court have agreed with them. We have also recognized that appellants had a reasonable basis for their position.

It is our view that the ambiguity in the will before us related to the administration of the trust and hence comes within the rule heretofore stated, which permits the allowance of fees and expenses in settling such questions even though the trustees may benefit personally by the outcome of the litigation. It was not the fault of the trustees that the will was ambiguous in the respect involved. We think it is just as important that the wishes of the testator be carried out concerning the compensation of the trustees as it would be if there were a dispute between two remaindermen relating to a division of the corpus. As indicated, we rule that the court properly allowed attorney fees and expenses in this case.

In addition to opposing the allowance of attorney fees on the merits appellants have raised two other points of a somewhat technical nature. First, it is said that fees may not be allowed because the trustees did not follow the cautionary instructions in the will to the effect that the employment of attorneys should be by written contract with the compensation agreed upon in advance. We doubt that that provision would be applicable in the situation before us. However, in any event, this defense was not pleaded, is not supported by proof, and cannot be raised for the first time on appeal.

The remaining point is that the court erred in sustaining the applications because they were filed by the attorneys, while allowances of this nature are properly made to the litigants and not to the lawyers. It is true that in discussing a different situation we made the statement, in Nelson v. Mercantile Trust Co., Mo.Sup., 335 S.W.2d 167, 175, "that in this type of case attorney fees and expenses are allowed to the litigant and not to the lawyers." We have, however, approved the allowance of attorney fees directly to the attorneys as, for example, in Jesser, supra. We regard this point as relating to form rather than substance. The applications were obviously filed with the knowledge and approval of the trustees and we cannot see that any of the parties would benefit if we should remand the case in order that the procedure suggested be followed. We accordingly rule this point against appellants.

This court has been asked to make an allowance of attorney fees and expenses for services rendered to the trustees on this appeal. We are authorized to make such allowances. Mercantile Trust Co. v. Muckerman, Mo.Sup., 377 S.W.2d 355. The attorneys briefed and argued the case in Division One and, after it was transferred to Court en Banc, filed an additional brief and argued the case again. A statement has been filed which shows the time spent by the attorneys in briefing and arguing the case. The attorneys for Mercantile have also expended a total of $808.55 for the printing of the two briefs. We have concluded that a reasonable additional allowance to the firm of Thompson Mitchell Douglas Neill & Guerri would be $7,725, and to John Grossman $2,625.

The judgment is affirmed. It is also ordered and adjudged that the firm of Thompson Mitchell Douglas Neill & Guerri be paid an additional sum of $7,725 for services as attorneys for co-trustee Mercantile on this appeal, and the sum of $808.-55 for expenses advanced; that John Grossman be paid the additional sum of $2,625 for services rendered as attorney for co-trustee Mary Anne O'Brien on this appeal. It is further ordered that all allowances for attorney fees and expenses, and all costs in the trial court and in this court, be paid out of the separate fund of $50,000 held by the State Treasurer for that purpose.

FINCH and MORGAN, JJ., concur.

HENLEY, C. J., concurs in that part of the opinion dealing with the issue concerning commissions trustees were entitled to retain and dissents on issue of allowance of attorney fees in separate dissenting opinion filed.

DONNELLY, J., concurs on issue relating to trustees' commissions and dissents on issue relating to attorney fees and concurs in dissenting opinion of HENLEY, C. J.

SEILER, J., dissents in separate dissenting opinion filed, and concurs in dissenting opinion of HENLEY, C. J.

BARDGETT, J., dissents and concurs in dissenting opinion of SEILER, J., and concurs in dissenting opinion of HENLEY, C. J.

PER CURIAM.

A majority of the judges being of the opinion that respondents are entitled to the trustees' commissions they retained, that part of the opinion of HOLMAN, J., relating to that issue is adopted as the opinion of the Court en Banc and the judgment of the trial court is, to that extent, affirmed. A majority of the judges being of the opinion that respondents are not entitled to the allowance of attorney fees, that part of the opinion of HOLMAN, J., relating to that issue is not adopted (is considered as a dissent on that issue) and the judgment of the trial court allowing attorney fees is reversed. The court costs in both the trial court

and this court are assessed against appellants and ordered paid out of the fund held by the State Treasurer for that purpose.

HENLEY, Chief Justice (concurring in part and dissenting in part).

I concur in the decision that the trustees are entitled to recover additional compensation, but find myself unable to agree with, and therefore respectfully dissent from, the holding that fees and expenses of attorneys for the trustees may be paid from the trust funds in this particular case.

For all practical purposes, the sole purpose of this litigation is to determine whether or not the trustees are entitled to additional compensation. It is a dispute between the trustees and the State, a simple dispute over which of the litigants is entitled to $190,730, the former claiming that they are entitled to the additional compensation and the latter claiming the contrary. In these circumstances, I see no logical reason for making a difference between these litigants and others. I would hold that the litigants should bear their own expense of litigation; that these trustees are not entitled to have the expenses of this litigation paid from the trust funds.

The theory that the settlement of this dispute in anywise relates to the administration of the trust and comes within the rule announced in the *Hereford* case, and other cases cited in the principal opinion, is, to me, a fiction. This litigation was not indispensable to the administration of the trust, except in the very limited and insignificant sense that it was necessary to settle a dispute between these parties as to whether the trustees would be paid additional compensation and, because all the funds were in the trustees' hands, whether, in the process of a final act of administration, the trustees would pay all or only a part of the trust funds to the beneficiary. In final analysis, it was indispensable only to a determination of whether the trust estate was indebted to the trustees. This conflict between the interest of the trustees on the one hand and that of the trust estate on the other should alone, if for no other reason, preclude the payment of the trustees' litigation expenses from funds of the trust.

SEILER, Judge (dissenting).

The majority opinion upholds the allowance of an additional commission of $190,730 to the trustees and fees and expenses to their attorneys for services at trial and appellate levels. I respectfully dissent from both these rulings, being of opinion that the construction given the testator's will and the allowance of attorneys' fees against the fund in this type of case run counter to the adjudicated cases.

The majority opinion properly points out that our search must be for the true intent and meaning of the testator, in which quest we must consider the will as a whole "and not give undue preference to any particular clause." Then, respectfully submitted, it proceeds to reach its conclusion principally on the basis of definitions of the word "disbursements", without sifting through the testamentary text for marks and indicia of testamentary intent. "Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing, * * * [b]ut it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary * * *.", Judge Learned Hand in Cabell v. Markham (C.C.A.2) 148 F.2d 737, 739. Paraphrasing his subsequent language, it must be remembered that testamentary trusts have some purpose or object to accomplish, whose sympathetic discovery is the surest guide to their meaning.

No one can read this record without being impressed with the fact that Mr. Babler's goal was to develop, improve and maintain a public park in honor of his brother within the 20-year period following his death. That is why he established this trust. His primary goal was not the accumulation of large funds to be turned over

to the state 20 years hence. His primary objective was the development and improvement of the park in the immediate future—during that 20 year period—and he deliberately elected to compensate his trustees on the basis of the amount they spent to accomplish his objectives. He drafted his will in a manner designed to encourage their expenditure of the funds available, within the prescribed limits each year. This is the message this will delivered to his trustees, briefly stated: "I want to develop a park in memory of my brother. I am hopeful that if it is properly planned and developed the state will take the park over at the end of 20 years. I am willing to pay you 7% of what you disburse during this period in improving and developing the park, and whatever is left I want you to turn over to the state." His intention was to insure the steady and substantial development of the park (originally raw land) over the period in question. The trust provisions of the will clearly contemplate a continuing expenditure of a considerable amount of money, both income and corpus, for these purposes. Item 14 directed the trustees to apply the *entire income* from securities to those uses and purposes. Item 15 authorized the trustees to spend all or any part of the net income, and in addition such part of the *corpus* of the trust estate (not to exceed 7% of the annual book value of the then corpus) as in their opinion and discre-

tion was deemed advisable. Any net earnings not spent during any current year were to be added to corpus. Any part of the 7% of corpus not spent in any year was to accumulate and be available in the following or subsequent years. The testator contemplated annual stops. In this setting, in Item 17, he provided trustees' compensation at the rate of 7% "of all disbursements of income and corpus." That he contemplated that the trustees' compensation would be figured and paid annually is a conclusion borne out by the provisions immediately following in Item 17, that if a trustee's services be terminated during the course of any year he should receive "a pro-rata part of *that year's* compensation," (our emphasis) and that a fractional part of a month should be considered as a full month.

It is clear from the will that testator was willing that during the 20-year active period of the trust the corpus of the estate might be materially depleted or even exhausted.[1] Mathematically, if the value of the estate had remained constant and the maximum 7% drain on the corpus had been pursued as an annual policy (a possibility Mr. Babler specifically authorized), the corpus of the estate would have been exhausted in 16 years or less. If that had happened there would have remained for final distribution nothing upon which the trustees could have made claim for further

---

1. This is not surprising, in view of Mr. Babler's intense determination to develop a fitting memorial for his beloved brother. Mr. Babler wanted the park graded and landscaped, roads and walks built, playgrounds, playing fields and recreational facilities provided, constructed, and properly equipped and such buildings as necessary erected (see exhibit 3, the original declaration of trust made by Mr. Babler). This required the expenditure of money in sizeable amounts, inasmuch as Babler Park is a 2,400 acre tract (Official Manual of State of Missouri, 1969–70, pp. 358-9).

This is why, in my opinion, Mr. Babler was careful to give his trustees authority to spend up to 100% of current net income and up to 7% of corpus annually, with the unused portion to be cumu-

latively available. It also explains why he set their compensation at 7% of all *disbursements* of income and corpus. He wanted them to develop and enhance the park and they were to be compensated for doing so. This is what he meant by "disbursements".

It is ridiculous to conclude that Mr. Babler was willing to pay his trustees to hoard and invest his money for 20 years and then, they having spent only small amounts on the park in the interim, turn it over to the state, intend that the trustees take 7% of the balance on hand at final distribution, on the theory that this was a "disbursement". Yet under the majority opinion this could happen; the trustees would get 7% either way they went. This is directly contrary to what testator was trying to accomplish.

commissions. This possibility supports the conclusion that testator intended that the full measure of the trustees' compensation should be 7% of all disbursements made annually as the administration of the trust proceeded. We believe that testator had this in mind when he fixed the compensation to be paid the trustees at the generous rate of 7%, which was 2% more than the statutory rate of commissions paid executors, and more than the Schedule of Fees of Mercantile Commerce Bank & Trust Company (the corporate trustee's predecessor), effective March 15, 1938, which in the case of testamentary trusts provided an annual commission of 5% of the gross income of the trust estate, and 5% of the market value of the principal of the trust estate, including real estate, "whenever the same is distributed by the trustee." [2] Testator's generosity was not without bounds, however, as is seen by his reduction of the fees of the executors (whom he intended to be one and the same as the trustees) from the statutory fee of 5% to 2%, in view of their dual roles.

There is this further consideration. Testator referred to the trustees' 7% commissions as "compensation for their services hereunder", services which were to be compensated to date at each year's end. The final transfer of assets to the state treasurer at the termination of the trust would require little work. It would be a fairly simple and uncomplicated task, particularly if the funds at the end of the 20-year period had been wisely disbursed and substantially expended, so as to have effectively achieved the desired objectives. It is unlikely that this testator, who was so circumspect in the matter of allowance of fees and commissions, envisioned what actually happened (the expenditure of comparatively small amounts for development through a period of unprecedented inflation during which the constantly accumulating funds reached large proportions at the end of the

20-year period) or that he intended that the trustees receive 7% of the total value of an estate over more than two and one-half million dollars. His desire was to pay the trustees for efficient annual expenditure (for disbursing, not saving) and not to pay them 7% of the total value of a large accumulation of unspent money for the simple act of distribution. We are certain he did not contemplate that his trust estate would be cut down nearly two hundred thousand dollars in commissions for the formality of distribution, and it is completely inequitable to countenance such a result.

It is significant that this lawyer-testator, whose preoccupation with the matter of compensation is so apparent (it was his method of making sure the park was developed and he referred to trustees' compensation six times and to executors' fees five times), prepared a 13-page will without using any language indicative of an intention to compensate the trustees at termination of the trust.

Item 16 provides for termination of the trust and final disposition of trust assets but neither in that item, nor elsewhere in the document, did testator mention compensation to the trustees at termination. There is no provision in this will that on final distribution the trustees first pay themselves 7% of unused income or undisposed of corpus and then transfer the net remaining assets to the state treasurer.

The only reference to Item 16 in the majority opinion is the statement that it is significant that in that item testator did not use the word "distribute", but stated that the remainder of the estate should be "paid over, transferred and conveyed". We fail to grasp the significance of this fact, which is no more enlightening than the fact that testator failed in Item 16 to use the word "disburse", on which the trustees so confidently rely. If testator had intended to compensate the trustees not only at annual

2.  As indicative of the common and accepted usages of the terms, note that Mercantile itself correctly used the term "distributed" in its schedule, and did not use the term "disbursed" in the context in which they now claim it appropriate.

stops but also on final distribution he easily could and no doubt would have inserted such a provision either in Item 16 or elsewhere in his will. He did not do so, doubtless because such a provision would have been inconsistent with his main goal. Instead, in Item 16 he directed that on the 20th anniversary of his death, or as soon thereafter as practical, the trust should cease and terminate, and that "the *entire remainder* of the trust estate then in the hands of my trustees, or the survivor of them, *both corpus and unused income and revenue*, shall *forthwith* on receipt thereof, be paid over, transferred and conveyed to the then Treasurer or Acting Treasurer of The State of Missouri, to be used and expended", et cetera (emphasis ours). He directed in certain terms, with no exceptions that *the entire remainder of the trust estate* be paid *forthwith* to the beneficiary without any provision for deductions for any purpose, and in particular without recognition of a right in the trustees to withhold part of the assets and for a closing-out fee on termination. The direction was peremptory, and the admonition was clear that all the trustees were to get was a receipt from the state treasurer.

As we have indicated, the majority opinion reaches its conclusion principally on the basis of definitions of the word "disbursements", which trustees maintain applies to all payments, expenditures, and distributions of every nature related to parting with assets, including final distributions. The opinion cites five cases in which opinion writers have used the term in discussing situations involving final distributions. In none of these cases was the question of nomenclature at issue; they are not cases involving the construction of the word "disbursements" as used in an instru-

ment.[3] The trustees cited them to show that this court has used this word to denote a transfer of corpus in the course of a final distribution. Whether testator so understood the word "disbursements" is speculative at best. The common usage, general acceptance, and dictionary definition of "disbursement" is a payment or an expenditure. "Even the tyro in the use of our mother tongue attributes no other meaning to the word than to pay out or expend." State ex rel. Thompson v. Board of Regents, banc, 305 Mo. 57, 264 S.W. 698, 701, a case directly involving the meaning of "disbursement" in the handling of funds. Ordinarily in the administration of estates and trusts, the term "disbursement" refers to a payment or expenditure during the course of the administration of the estate or trust. A disbursement is usually a pay-out in satisfaction of a debt or claim, or an appropriation made under an order of court. In common legal parlance, "disbursement" is not a term frequently associated with the final pay-out or transfer of assets at the termination of estates or trusts. At that juncture in the administration, the technically correct term is "distribution" or "final distribution" or "distribution of assets". Item 25 of the will demonstrated testator's familiarity with the statute fixing executor's fees (Sec. 220, RSMo 1939), which statute referred to "disbursements and appropriations" made by order of the court during the course of an administration. Doubtless testator, who was knowledgeable in the language of the law (in addition to testator's background as given in the majority opinion, it should also be stated he was a district delegate to the 1943 Constitutional Convention, Official Manual of Missouri, 1943–44, p. 169), appreciated the statutory distinctions between disbursements and distribution.[4]

3. It is respectfully submitted this fact is ignored by the majority opinion, which ascribes to the testator knowledge of a certain meaning for the word "disburse" based on these cases, despite the fact the cases do not purport to touch the issue.

4. Joining issue on the matter of dictionary definitions, while it is true that "distribute" is included among the secondary meanings of "disburse", the primary dictionary meaning of "disburse" is "to pay out or expend". Neither the 2nd nor

The fact is, as the attorney general contends, that the allowance of additional commissions in the sum of $190,730 is "inequitable, unreasonable and unconscionable". I recognize that if additional compensation were due under the terms of the will this would be an extraneous consideration, but it is not due for the reasons heretofore stated. To hold that it is due requires a strained construction which, when we consider the minimal services rendered by the trustees, results in a miscarriage of justice.

From the oral testimony admitted and the offers of proof, it appears that, abdicating their responsibility, the trustees entrusted to another group the exercise of the discretion vested in them by the will, contenting themselves with doing nothing to carry out the objects of the trust except to disburse funds requisitioned by that group. In 1937, Jacob L. Babler, by a separate instrument, created a trust called Jacob L. Babler Perpetual Endowment Trust Fund for Dr. Edmund A. Babler Memorial State Park, to turn the 2,400 acres of raw land into a park with grading, landscaping, roads, walks, playgrounds, playing fields, recreational facilities, equipment, and buildings. He named five trustees to administer the fund which then consisted of Mr. Babler's interest in certain Mexican lands leased to an oil company. Within a few years the Mexican government expropriated the oil lands and the trust was not otherwise funded. When Mr. Babler drafted the will which is before us, he knew these facts and the testamentary trust here for construction recited the same objectives and purposes as the 1937 trust. Despite the fact that the testamentary trust imposed upon the testamentary trustees affirmative duties requiring the exercise of their discretion in the management, operation and planning of and for the park, Mercantile and the individual trustee used the perpetual endowment trustees to oversee the park and make the real decisions with respect to construction, alterations and changes, thus failing to exercise personally the discretion vested in them, and relieving themselves of the burden of management and administration entrusted to them. The situation was described in these words by counsel for the individual trustee in oral

3rd edition of Webster's International gives "distribute" as a synonym of "disburse". The exact word used in Item 17 of the will is "disbursements". The law dictionaries define this word as meaning money paid out or an amount or sum expended. See Cyclopedic Law Dictionary, Black's Law Dictionary, Bouvier's Law Dictionary. None that I found defined "disbursements" as meaning "distribution", nor am I able to find any support for the statement in the majority opinion that " 'disbursement' is a more general word and includes distribution". It is not so defined in 26A C.J.S. p. 968, cited in the main opinion, or anywhere else that I can find. Webster's 2nd Edition, which is more apropos to our problem here since it was published in 1935 and available during testator's lifetime, whereas Webster's 3rd was not published until 1967, gives apportionment, allotment, dispensation, disposal, dispersion and arrangement as synonyms of distribution. It does not give disbursement as a synonym. It allots a third of a column to "distribution" and its meanings. It allots only two lines to "disbursement".

It is much more likely that the testator, Mr. Babler, who was a careful lawyer and meticulous draftsman, with considerable probate and trust experience, considered the word "distribution" to mean, as the majority opinion concedes its general meaning to be, "the payment or delivery of assets at the termination of probate estates", than that he considered it as a synonym for "disbursements".

I see no significance in using the term "use and expend" in Item 15, which authorizes the trustees to make yearly expenditures on the park, as related to our problem of whether under the provisions of the will the trustees are entitled to an additional 7% on final distribution. A "use and expend" disbursement made under Item 15 as part of current annual expenditures for the maintenance and development of the park, which testator was clearly encouraging his trustees to make by allowing them a commission on all such expenditures, has no relation to whether turning the corpus over to the state at the end of 20 years is a disbursement.

argument before us: "Insofar as the expenditures of the park are concerned, that was supervised and controlled exclusively by trustees which had been named by an indenture which had been created about six years before he wrote this will. Those trustees functioned during the entire 20-year period of the administration of this trust estate. It was they who made requests for appropriations at the end of every year * * *. The trustees of Babler Park ran the park. It was they who ordered improvements, it was they who hired employees of the park to cut the grass or to maintain it or do anything else that was necessary * * * They [the trustees under the will] had nothing to do with the supervision of the park. All they had to do was pay these trustees."

The offhand manner in which the trustees treated the directions written into his testament for their guidance by Mr. Babler is further illustrated by the fact that the trustees completely ignored Item 24 of the will, which cautioned the trustees in the event the trust be involved in litgation and the services of attorneys be required, "to have a written contract with such attorneys and counsel, made in advance of any services rendered, with specific arrangements as to fees and compensation, and under no circumstances, should attorneys be engaged without a definite written understanding, made in advance, as to what their charges will be."

Strange as it may seem, the trustees for a long time failed to give any formal accounting of their stewardship of this trust over the 20-year period, despite the rule that the right of a beneficiary to an accounting follows as a matter of course,

Engelsmann v. Holekamp (Mo.Sup.) 402 S.W.2d 382, and notwithstanding the written demand of the attorney general for a verified written accounting of their management and disposition of the trust property from the dates of their appointments as successor trustees. It was not until after this case had been tried and the trial court prodded the trustees, expressing surprise that an accounting had not made, that they finally did file an accounting. This reluctance to account was not the subject of any complaint in the motion for new trial or on appeal and so the point has not been preserved for appellate review, but it is noteworthy that these trustees, now claiming nearly a fifth of a million dollars as additional compensation for their services, did not take their responsibilities seriously enough to make an accounting on written demand by the legal representative of the beneficiary until pointedly urged to do so by the trial court.

Trustees urge that appellants' construction will result in their having been "most poorly compensated" for their services and would limit them to "meager compensation", contrary to the generous treatment of the trustees intended by testator. The $56,000 represents 7% of the total amount of income and corpus disbursed during the term of the trust. Had there been no express provision in the trust fixing the trustees' fees or providing any basis for computing them, and no subsequent contract relating thereto, the trustees' commissions, if the general rule had been followed, would have been based upon the *amount of the yearly income received and paid out by them,* see In re Buder, banc, 358 Mo. 796, 217 S.W.2d 563, 573.[5] In such case the

---

5. In view of the rule stated in the Buder case, it is difficult to understand how the trustees or the court could believe that testator in the present case intended the trustees to receive a commission on the corpus at termination unless he specifically spelled it out, which he certainly did not do as witness this litigation. This is because the Buder case, at 217 S.W.2d 1. c. 573 declares: " * * * *Absent a contract and absent a provision in the trust*

*instrument fixing the basis for computing trustees' commissions, the allowance as a trustees' commission of a portion of corpus upon final distribution to the beneficiaries (or remaindermen) does not go as a matter of right* but is a matter wholly within the discretion of the court. There could be circumstances, of course, of unusual or extraordinary character in the matter of the services rendered which would justify a court in departing from

court would have allowed reasonable compensation and likely would have approved the more modest rate of 5%, considering that Mercantile's own Schedule of Fees specified "[f]ive per cent on the gross annual income of the trust estate as and when distributed" as the commission on income applicable to testamentary trusts. The compensation actually received was not poor or meager. The $56,000 received represents more than 4% of the average market value of the entire trust during the 20-year period.

Trustees further urge that appellants' construction would place them in a position to deal in their own behalf with the trust assets and invite them to dissipate the assets as rapidly as possible in pursuit of their own self interests to the possible detriment of the trust. It is a strange argument for a professional trustee to say, "Since I may waste the property if I know I can collect commissions only on the amount I spend annually, therefore, you must make sure I do not succumb to this temptation, by permitting me to collect a commission on the balance remaining at final distribution." The possibility of dishonesty on the part of the trustees is no argument for placing a certain construction on testamentary language. If trustees should violate their trust and engage in the perfidy suggested they would be subject to removal. For any losses sustained by the trust by reason of acts done in bad faith or for self aggrandizement, they would be liable to reimburse the trust. The trustees were legally bound to properly discharge the trust responsibilities assumed and are entitled to no extra credit for faithful performance. By accepting the trust the trustees bound themselves to accept the compensation fixed by the trust instrument, and are prevented from collecting a larger sum. In re McKinney's Estate, 351 Mo. 718, 173 S.W.2d 898, 902; Marshall v. St. Louis Union Trust Co., 209 Mo.App. 13, 236 S.W. 692, 693; Oppliger v. Sutton, 50 Mo.App. 348; Anno. Trustees and Executors—Fees, 19 A.L.R.3d 520, 529, Sec. 6 [a]. We cannot read beneficial provisions into a trust agreement on the basis of meritorious service.

Considering the will from its four corners, together with the extrinsic evidence noted, we conclude that testator intended

the *general practice of allowing trustees' commissions only out of the yearly income received and disbursed.* That, however, is a question for the court to determine in each such case before it. * * *" (emphasis supplied).

The rule of the Buder case was reaffirmed in In re Franz' Estate, 359 Mo. 362, 221 S.W.2d 739, 741–742 and in Morrison v. Asher (Mo.App.) 361 S.W.2d 844, 851. The rule was earlier applied in Kilpatrick v. Robert, 278 Mo. 257, 212 S.W. 884; Cornet v. Cornet, 269 Mo. 298, 190 S.W. 333 and In re Mays' Estate, 197 Mo.App. 555, 196 S.W. 1039.

In the present case, the majority opinion makes mention of a custom in St. Louis to award trustees a commission on corpus on termination, saying this is "a very convincing factor" and in accord with the general rule. It is not in accord with the Missouri rule as declared in Buder and applied in the earlier cases, and I doubt if the testator, a knowledgeable lawyer, thought it was.

The majority opinion rests this custom not on the testimony of any witness in the record, but entirely on exhibit 2, Mercantile's Schedule of Fees, and on a concession by the state in oral argument. It seems to me the fact that Mercantile publishes a printed fee schedule is the direct opposite of custom. It shows that Mercantile is not willing to leave its trustee's fees to custom, whatever it may be, if there is a custom, but instead specifies its fees in writing. It may be that, in order to remain competitive, we can assume that Mercantile's fees, and to what they applied, were about the same as what the other trust companies did, but this still does not make it a matter of custom.

Mr. Weidert, who was one of the original trustees, helped Mr. Babler draft the will. Mr. Weidert was a salaried lawyer in the employ of Mercantile Trust, so I feel sure Mr. Babler knew what the Merchantile schedule was and would have no part of it. Mr. Babler pointedly did not authorize a commission on principal when it was distributed by the trustees. Instead he provided for compensation only on disbursements. There is every reason to believe he did this for a reason and not because he somehow believed distribute and disburse meant the same thing legally.

that the measure of the trustees' compensation be an annual payment calculated at the rate of 7% of all amounts disbursed by them, without additional allowance on final distribution. To uphold the decree of the circuit court we would be obliged to read into the will something that is not there and give expression speculatively to an intention not clearly discernible from the language used by the testator and at war with what he was trying to accomplish under the trust. The withholding by the trustees of $190,730 from the assets of the estate at termination of the trust cannot be sustained.

The other question is the propriety of any allowance of attorneys' fees and expenses for successfully charging the trust estate an additional $190,730 in commissions—winning the case and making the trust estate stand good for the payment of attorneys' fees and expenses. The majority opinion seeks to justify these allowances on the ground that an ambiguity existed in the trust instrument resulting in a legitimate controversy as to the proper distribution of the trust fund or the administration of the trust; that this ambiguity resulted in an impasse in the dispute between the trustees and the state treasurer; that the estate could not be finally terminated and the assets delivered to the beneficiary until this question was determined; that it was reasonable and essential that the suit be filed; that the trustees had a reasonable basis for making their claim; that a trust fund should bear the expense of its own administration, and that these allowances should be made even though the trustees would benefit by the outcome of successful litigation.

No case is cited in the majority opinion authorizing an allowance in this situation. As authority the opinion quotes excerpts from Jesser v. Mayfair Hotel, Inc. (Mo. Sup. banc) 360 S.W.2d 652, and Coates v. Coates (Mo.App.) 316 S.W.2d 875, and cites Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104; St. Louis Union Trust Company v. Kaltenbach, 353 Mo. 1114, 186 S.W.2d 578; Kingston v. St. Louis Union Trust Co., 348 Mo. 448, 154 S.W.2d 39; and Lang v. Taussig (Mo.App.) 194 S.W.2d 743.

None of these cases justifies these allowances. The quoted excerpts must be considered in the context of the facts in those cases. The quotation from Jesser, while apropos to the facts of that case, should not be applied in the case before us. The issue in Jesser was not the right of persons in the position of these trustees to commissions and attorneys' fees. Attorneys' fees were allowed in Jesser as a sequel to litigation instituted by the beneficial owners of corporate stock issued in connection with a reorganization plan. The beneficial owners brought a suit in equity against the trustees named in a voting trust agreement to enjoin them from consummating a proposed plan to sell the stock. On appeal this court found that the *primary and dominant purpose* of the litigation was to enjoin an unauthorized and unlawful sale of trust assets and that the result of plaintiffs' action was to *preserve and keep intact the trust estate*; that the construction of the voting trust agreement was of primary importance and not merely incidental. In that case we said: "Where one goes into a court of equity and takes the risk of litigation on himself and successfully creates, protects, or preserves a fund or brings about the creation, increase, or protection of a fund in which others are entitled to share, those others will be required to contribute their proportionate part of counsel fees and expenses, and the equitable way to apportion these fees and expenses is to allow them against the fund. * * *", 360 S.W.2d l. c. 661. The object and result of the suit was to preserve and keep intact a trust estate and to prevent a wrongful disposition of trust assets. The protection of a fund in which others were entitled to share was involved. What the parties did benefited the fund, and only incidentally benefited themselves. In the case at bar, the primary purpose of the litigation instituted by the trustees was to collect commissions claimed by them. Nothing they

did kept the trust estate intact, but could only diminish and partially deplete it. The fund was not benefited. No other parties were benefited. The resolution of an impasse was strictly incidental and could have been readily solved by turning the corpus over to the state and holding out only the disputed amount for fees so that the operation of Babler Park could have gone on without interruption. The fact is that the trustees had already paid themselves the commissions and this, undoubtedly, was an important factor in their taking the position they did. In such case the litigating parties should be required to bear the expense of the litigation, the principal and dominant purpose of which is self-serving.

The quotation from Coates v. Coates, supra, which on its face would seem to justify the allowances, likewise was expressed in a wholly different setting. In the Coates case there was a legitimate dispute between testamentary trustees and beneficiaries as to whether capital gains in mutual fund companies would be regarded as corpus (and go into the principal) or as income (and go to the life tenant). These two interests were disputing the proper allocation of these funds. It was in that background that the court properly stated that a trust fund should bear the expenses of its own administration. In Trautz v. Lemp, cited in the majority opinion, this same rule was held *inapplicable* where litigation was instituted merely " * * * to enable the litigant to obtain something as an heir" [the same would apply to obtaining something as a trustee], and the court held attorneys' fees " * * * should not be allowed, even if the litigation incidentally settled the status of the trust estate, that not being the purpose of the litigation", 72 S.W.2d l. c. 108. The citation of St. Louis Union Trust Company v. Kaltenbach in

the majority opinion is puzzling, since there the court made clear that parties to litigation of this sort who make contentions solely for their own benefit and whose efforts will not result in *"real benefit* to the estate" (emphasis supplied) are not entitled to any allowance out of the estate. Kingston v. St. Louis Union Trust Company, cited in the majority opinion, is not persuasive under the present facts because there attorneys' fees were allowed to vested remaindermen for maintaining litigation to settle a legitimate dispute between them and the trustees arising out of the interpretation to be placed upon an ambiguous provision of a will, which if determined in favor of plaintiffs would have entitled them to certain substantial annuities. In the Leggett v. Missouri State Life Insurance Company case, the efforts of the attorneys there resulted in the recovery and recapture of several million dollars for the benefit of those entitled to the distribution of the fund, which is the direct opposite of the situation in the present case.

We believe it can be confidently stated that in no case cited in the majority opinion or to be found in the law of this state has the court allowed attorneys' fees to a trustee who institutes litigation not for the purposes of settling conflicting claims or to resolve legitimate disputes of entitlement to the fund, but for the purpose of settling the trustees' own claim to commissions.

Counsel should be required to look to their clients for the fees earned and expenses incurred. The record shows counsel for the individual trustee does not intend to charge her anything if he is not successful. Counsel for the corporate trustee say they intend to bill their client for $22,500 for services through the trial court (and presumably more for services here) if fees are not allowed.[6]

---

6. The majority opinion rests approval of allowance of attorneys' fees on the proposition that since the trustees were contending they were entitled to the 7% on corpus on termination, while the state treasurer was refusing to accept the transfer of the property unless all the assets were delivered to him, " * * * the trust estate could not be finally determined and the assets delivered to the State Treasurer until this question was determined by the courts. * * * *", so, it is argued, suit had to be filed, with all the favorable consequences for the trustees.

The applicable rule is that litigants whose action is not of benefit to the trust estate (not filed to create a fund, or to preserve, protect or augment or prevent the dilution or diminution of an existing fund), but is filed for the dominant purpose of obtaining commissions for themselves, thus promoting interests adverse and antagonistic to the estate which, if successful, will result in the depletion of trust assets, must finance their own lawsuit. The *"no benefit-no fee"* principle is embedded in our law and has been applied frequently. In Clark v. Mississippi Valley Trust Co., 357 Mo. 785, 211 S.W.2d 10, a life beneficiary of a trust sued the trustee, alleging that the latter had not paid him allowances according to the intention of the settlor. Attorneys' fees for prosecuting the action were not allowed out of the trust estate because plaintiff instituted the action for his own benefit and not for the benefit of the trust estate. In St. Louis Union Trust Co. v. Kaltenbach, supra, 186 S.W.2d 1. c. 583, where it was necessary for a trustee to institute proceedings to construe a will to ascertain what was meant by an ambiguous provision with reference to the vesting of an estate and to obtain directions with respect to which parties should take, it was held proper to allow attorney's fees to the trustee, but not to the defendants because "each defendant was contending for a construction under which he could obtain the whole estate for himself. Their contentions were solely for their own benefit and they are not entitled to any allowance out of the estate for merely seeking to benefit themselves." Where the purpose of the action is not merely for the purpose of construction of the trust instrument, but for the purpose of the destruction of the trust estate the rule, as stated in Trautz v. Lemp, supra, 72 S.W.2d 1. c. 107, is that "Where an instrument that creates a trust estate is so ambiguous that two or more persons may fairly make an adverse claim to the fund, either may resort to a court of equity for correct interpretation, and the court is justified in not only assessing the cost of the litigation against the estate, but also in allowing reasonable attorneys' fees payable

The obvious solution, so that the business of operating the park could get on, was to turn the trust estate over to the state, holding out the amount in dispute as to commissions and a reserve for attorneys' fees. Only the trustees could arrange this, because they had possession of all the funds and property. Once this simple step is taken, the aspect of there being some endangering or impeding of the administration of the primary objective of the trust—operation, maintenance, and development of the park—vanishes.

This is actually what the parties did by stipulation made January 25, 1967, before the case was tried. When this case was tried and all through the subsequent motions and appeals, the only objective of the trustees has been for their personal gain. The transfer of the trust estate corpus had long since been made to the state and the park was being operated by the State Park Board.

Further, the record shows that the trustees had already paid themselves the $190,730 in commissions before the litigation commenced. It was not escrowed. The individual trustee has already paid income tax on her share. It was because she feared the corporate trustee was considering working out some settlement with the state on the disputed commissions that she felt she should retain separate counsel. This points up how personal to the trustees and how exclusively for their sole benefit this litigation is and has been.

The trustees filed suit July 6, 1966. They had earlier assured the attorney general that his letter of February 2, 1966, wherein he stated the position of the state, had been referred to their counsel and that the state would hear from them within ten days. This was in February 1966. In April 1966, the attorney general again wrote the trustees, pointing out he had heard nothing further from counsel despite the trustees' promise of a reply within ten days.

In November 1966, the trustees wrote the state treasurer and for the first time offered to turn over the trust corpus, except for holding out the amount of the disputed commissions and a reserve for attorneys' fees. In this letter the trustees frankly describe their pending declaratory judgment suit thus: "This suit involves the question of the trustees' right to compensation for their services, seven percent (7%) of all disbursements of income and corpus made by them, to be divided equally between them." That is all this case has ever been.

out of the trust estate both to the defeated and succesful parties. * * * *But this rule does not apply where the bill is not filed merely for the purpose of obtaining a construction of the instrument creating the trust and the direction of the court, but to enable the litigation to obtain something as an heir. * * * Under these circumstances the cost including the attorneys' fees should not be allowed, even if the litigation incidentally settled the status of the trust estate, that not being the purpose of the litigation. * * *.* [I]n what way would the trust estate have been benefited? The only answer we can see to this question is that the trust estate would not have received any benefit, in fact, the trust estate would have been destroyed. 'There is no equity in requiring the trust fund to remunerate those whose sole claim to consideration is the fact that they endeavored to destroy that fund.'" (our emphasis). See also, Thatcher v. Lewis, 335 Mo. 1130, 76 S.W.2d 677, 684; Hereford v. Unknown Heirs (Mo.App.) 306 S.W.2d 648, 651; Mercantile Trust Co. v. Hammerstein (Mo.Sup.) 380 S.W.2d 287, 292, and 96 C.J.S. Wills § 1096, p. 809.

The same rule applies where the purpose is the *diminution* of the trust estate. In Leggett v. Missouri State Life Insurance Co. (Mo.Sup. banc) 342 S.W.2d 833, 936, the foregoing rules were restated, with this caveat: "* * * This rule is more properly stated that there can be no allowance of counsel fees from a fund if the interests of the party claiming the allowance are antagonistic to those entitled to the fund. Annotations 49 A.L.R. at p. 1160. The usual situation in which this rule applies is where a party by litigation seeks to destroy or *diminish* the fund. * * *" (our emphasis).

The ruling of the majority opinion on the subject of attorneys' fees and expenses establishes new law which, carried to its logical conclusion, opens up a dangerous potential. Any time in the future that a fiduciary claims commissions which remaindermen or other beneficiaries consider

not allowable, or excessive, the trust estate will be burdened with the payment of the attorneys' fees incurred in the fiduciary's effort to get more for himself (even in a case where, as here, the balance of the estate has been turned over to the distributee). This will constitute an open invitation to fiduciaries to litigate for dubious or excessive allowances and commissions, secure in the knowledge that the litigation will cost them nothing, since the attorneys' fees and expenses will have to be paid out of the trust fund.

For all of the foregoing reasons I would reverse the judgment and decree and remand the cause with directions to enter a judgment and decree consistent with this opinion, directing the trustees to transfer to the state treasurer for the uses and purposes expressed in the trust instrument all assets of the trust estate withheld by them, without deducting any amount for trustees' commissions on final distribution or for fees and expenses of attorneys in the trial court or on appeal.