The FIRST NATIONAL BANK OF KANSAS CITY, Plaintiff-Respondent,

v.

John C. DANFORTH, Attorney General of Missouri, Defendant-Appellant,

and

Lakeside Hospital Association et al., Defendants-Appellants,

and

Martin Luther King Jr. Memorial Hospital, Appellant,

and

Mary Elizabeth Blethroade Sutt et al., Defendants-Appellants,

and

St. Luke's Hospital of Kansas City, Missouri, et al., Defendants-Respondents.

No. 58488.

Supreme Court of Missouri, Division No. 1.

Jan. 13, 1975.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 10, 1975.

Certiorari Denied May 27, 1975, June 9, 1975. See 95 S.Ct. 1999, 2424.

Hilary A. Bush, Kent Snapp, James L. Burgess, James M. Beck, Johnson, Lucas, Bush & Snapp, Kansas City, for plaintiff-respondent.

John C. Danforth, Atty. Gen., B. J. Jones, Asst. Atty. Gen., Jefferson City, for appellant, John C. Danforth.

Charles C. Shafer, Jr. and Howard Chamberlin of Shafer & Chamberlin, A Professional Corp., Kansas City, for Martin Luther King, Jr. Memorial Hospital.

Lane D. Bauer, Kansas City, David M. Roberts, Tacoma, Wash., and Harvey L. Kaplan, Shook, Hardy & Bacon, Kansas City, for defendant-appellant Lakeside Hospital Assn.

Lem T. Jones, Jr. and Russell Stover Jones, Kansas City, for defendant-appellant Research Hospital and Medical Center.

Darrell L. Havener, Watson, Ess, Marshall & Enggas, Kansas City, for defendant-appellant Northeast Osteopathic Hospital.

Daniel M. Dibble and Maurice J. O'Sullivan, Jr., Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, for defendants-appellants Kansas City General Hospital and Medical Center and Children's Mercy Hospital.

Robert A. Babcock, Margolin & Kirwan, Kansas City, for defendant-appellant Jewish Memorial Hospital Assn.

Keith Wilson, Jr., Independence, for defendant-appellant Kansas City College of Osteopathic Medicine.

Paul Scott Kelly, Jr., and Terry J. Brady, Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, for defendant-appellant Sisters of Saint Mary (Owning and Operating St. Mary's Hospital).

Richard E. Duggan, C. Harold Mann, Kansas City, for Baptist Memorial Hospital.

Thomas J. Leittem, William B. Prugh, Shughart, Thomson & Kilroy, Kansas City, and Thomas H. Bennett, Independence, for Independence Sanitarium and Hospital.

Lawrence R. Brown, Lawrence M. Berkowitz, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for Kansas City Lutheran Home and Hospital.

Edward T. Matheny, Jr., Larry L. McMullen, Thomas W. Wagstaff, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for St. Luke's Hospital.

Walter A. Raymond, Kenneth C. West, Paul R. Shy, Raymond, West & Shy, and Charles E. Thomson, Kansas City, for Known Heirs.

Jesse L. Childers, Kansas City, for Unknown Heirs.

HIGGINS, Commissioner.

Appeal from declaratory judgment in construction of and upholding a public charitable trust which purports to discriminate among its beneficiaries by race, religion, and national origin. Among the questions is whether the construction involves the State of Missouri and requires the exercise of its powers as to subject the trust to requirements of the United States Constitution, Amendments I and XIV, and Missouri Constitution, Article 1, Sections 2, 5, 7, and 10, V.A.M.S.

Also involved is an appeal by the Attorney General from a judgment awarding attorneys' fees, said judgment being designated as a separate final judgment for purposes of appeal. Rule 81.06, V.A.M.R.

Homer McWilliams, a bachelor, died testate December 21, 1965, aged 98 years. He was hospitalized in Trinity Lutheran Hospital continuously for the last 18 years of his life. Excluding several irrelevant minor bequests to cousins and friends, his Last Will and Testament, executed November 16, 1934, as modified by its First Codicil, executed March 20, 1946, provided that

the bulk of his estate was to be held in trust for certain charitable purposes. The net value of the trust as of December 21, 1965, was $8,485,891.22.[1]

Article XV of the will and codicil devised the remainder of testator's property to his trustees; established the "Mc-Williams Memorial Hospital Trust"; and directed "that the net income from the Trust Estate * * * be used annually by the Trustees * * * in contributing to the maintenance and support of Protestant Christian Hospitals operated and maintained upon a non-profit basis in * * * Jackson County, Missouri, * * * and/or contributing to the maintenance, support and care of sick and infirm patients in said Hospitals, born of white parents in the United States of America. * * * And I give my said Trustees * * * full power and authority to select, and to give these benefits of this Trust, and to make such distributions to, said Hospital and Hospitals of the kind and character aforesaid as in the judgment and discretion of the Trustees, * * * as they * * * shall determine to be giving and will continue to give the greatest measure of hospital service and care to deserving poor and unfortunate people of the class aforesaid."

On May 21, 1969, the First National Bank of Kansas City, as sole surviving trustee, filed a petition which it amended June 18, 1970, "to construe a private and a public charitable trust." The amended petition was in six counts, and named as defendants the Attorney General of Missouri, all twenty-three licensed hospitals believed by plaintiff to be located in Jackson County, and the known and unknown heirs of Homer McWilliams.

In Count V of the petition, the only count relevant to this appeal, plaintiff alleges that it "is unable to ascertain with certainty the meaning of said words (Article XV of the Will) and cannot determine with certainty which hospitals in Jackson County, Missouri, and which patients therein, qualify as possible beneficiaries of the trust."

The petition was separately answered by Mary Elizabeth Blethroade Sutt, Elizabeth May Jackson, Carly McWilliams, and Casley McWilliams, each claiming to be collateral heirs of Homer McWilliams; asserting illegality of the trust provisions and that Mr. McWilliams had no general charitable intent; that therefore the trust failed and they were entitled to the res as lawful heirs of the testator. The unknown heirs through their appointed attorney took a similar position.

The defendant hospitals who are now appellants (Lakeside Group) separately answered, each asserting that it qualified as a beneficiary of the trust; that compliance with the trust provisions would be discriminatory, illegal, and impossible; and that since testator expressed a general charitable intent, the cy pres doctrine should be applied to qualify all nonprofit nongovernmental hospitals in Jackson County and all indigent patients therein as beneficiaries.

The defendant hospitals who are now respondents (St. Luke's Group) separately answered, each alleging that it was a Protestant Christian hospital, operated on a nonprofit basis in Jackson County, caring for sick and infirm patients of all races, colors, creeds, and nationalities, and providing hospital service to deserving poor and unfortunate people; that therefore it qualified as a beneficiary and that the class of patients for which hospital care and services are provided by it, qualifies as a beneficiary under the Trust.

Each of the eight hospitals in the Lakeside Group are tax exempt, nonprofit corporations in Jackson County, Missouri, and licensed under the Missouri Hospital Licensing Law. All have been incorporated by pro forma decree or under the Missouri Not-For-Profit Act. None has any affilia-

---

1. As of January 17, 1974, the value of the trust had increased to $11,392,703.00.

tion or connection with any organized church except St. Mary's Hospital which is operated by the Sisters of St. Mary, a Roman Catholic Order. All admit substantial numbers of charity patients, and none discriminates among its patients, employees, or medical or administrative staff on the basis of race or religion. All are qualified to and do receive governmental Medicare and Medicaid payments, as well as federal funds under Hill-Burton, Federal Manpower, or other Acts.

Each of the four hospitals in St. Luke's Group is also located in Jackson County and is organized and operated in the same manner as the hospitals in the Lakeside Group, except that federal funds received by Baptist Memorial Hospital have been limited to Medicare and Medicaid, and except that each has a special relationship with and is controlled in part by a Protestant Christian Church.

Dr. Robert K. Ordway, President and Dean of the Missouri School of Religion in Columbia, Missouri, expressed opinions in definition of "Protestant" and "Christian." " 'Christian' is a term which applies to a body of religious belief and thought and doctrine in which the person, the ministry of Jesus Christ is of paramount importance." Dr. Ordway ascribed two meanings to "Protestant." "The generally accepted understanding of the term 'Protestant' " meant "any Christian religious group which is not either Roman Catholic or Orthodox." In his second and more technical definition, " * * * a 'Protestant,' to speak of a person, is a person who is a member of one of the religious bodies which is able to trace its historical heritage in general to the time of the Reformation, the 15th, 16th [and 17th] centuries, and including specifically the historical perspective that this group originated in some form of protest or an attempt to reform the Roman Catholic Church at that time."

Pursuant to these definitions, Dr. Ordway stated that there were various organizations in Missouri and in the United States which are generally known as Protestant Christian bodies, but which are not organized churches in themselves. Such bodies offer a wide range of social services including homes for children and aged, and schools and hospitals. In order to define such a nonchurch Protestant Christian institution, Dr. Ordway stated, "[t]he basic criteria would be that there is some definable formally accepted relationship which involves either expressed or implied control of that institution by the religious body." This relationship of control also involves "accountability" to the religious body. Without some formally accepted relationship, accepted by both the hospital and the Protestant denomination, such hospital would not qualify as a Protestant Christian Hospital.

In Dr. Ordway's opinion, the Baptist, Lutheran, and Episcopal churches are "Protestant Christian" churches under both his general and technical definitions; and based upon pertinent provisions of their charters and operations to be more fully stated below, their hospitals, Baptist Memorial, Trinity Lutheran, and St. Luke's, would qualify as Protestant Christian Hospitals. The Reorganized Church of Jesus Christ of Latter Day Saints and its hospital were "Protestant Christian" under his general definition; he was unsure whether they qualified under his technical definition.

Dr. Carl Oliver Bangs, a professor of historical theology at St. Paul's School of Theology in Kansas City, agreed with Dr. Ordway that "Protestant" in its general and common sense meaning was any Christian religious group which is neither Roman Catholic nor Orthodox. In his opinion, the Reorganized Church of Jesus Christ of Latter Day Saints can trace its heritage to the Protestant Christian Reformation, and it and its Independence Sanitarium and Hospital are Protestant Christian entities.

Baptist Memorial Hospital was organized by a group of local Kansas City citi-

zens of the Baptist faith, working primarily through local Baptist churches. The idea and concept of the hospital, although local in origin, evolved into part of the State Baptist Church Organization in Missouri. Its operation is directly controlled and accountable to the annual meeting of the Missouri Baptist Convention. Its purpose "is to found and maintain in Kansas City, Missouri, a hospital, of the highest standards * * * wherein to care for the sick and the afflicted in body and to administer to the bodily needs and to provide loving attention and nursing and service of skilled physicians and surgeons for restoration of such person to health and strength. And therein and thereby do deeds of benevolence of Christian charity to the sick and afflicted in which connection and as incident to the care and treatment of the sick and afflicted, to administer in the name of Christ to their spiritual needs and to the advancement of their spiritual welfare." The hospital must be affiliated with and subject to the Executive Board of the Missouri Baptist Convention. It must be governed by a board of trustees of thirty persons, at least 75 per cent of whom must be Baptists. The hospital cares for both charity and pay patients.

Independence Sanitarium and Hospital must "be operated as a non-profit, non-sectarian institution according to the statutes of this state and patients shall be received and treated without regard to nationality, religion, social or financial position." It is accountable to the Reorganized Church of Jesus Christ of Latter Day Saints with international headquarters in Independence. Its original incorporation was sponsored by the Reorganized Church of Jesus Christ of Latter Day Saints. Among its aims and objectives is "to be guided by Christian principles, as understood by a sponsoring church—the Reorganized Church of Jesus Christ of Latter Day Saints—in all of its patient care and educational activities." Its policies are established in accordance with the principles of the Reorganized Church of Jesus Christ of Latter Day Saints which has a full measure of control over the appointment of the hospital's governing board. The Board of Trustees is responsible to the Reorganized Church of Jesus Christ of Latter Day Saints. Of the 9-member board, three are members of the Presidency of the Reorganized Church of Jesus Christ of Latter Day Saints and three are members of the Presiding Bishopric of the Church, the six highest spiritual and temporal leaders of the Church. At least six full-time administrators must also be ministers of the Church. The Reorganized Church of Jesus Christ of Latter Day Saints provides financial support for the hospital building fund and for indigent patients. If dissolved, the hospital's assets must be transferred to the Bishop of the Reorganized Church of Jesus Christ of Latter Day Saints.

Trinity Lutheran Hospital is owned and operated by Kansas City Lutheran Home and Hospital Association. Kansas City Lutheran is operated under the control and auspices of the Central States Synod of the Lutheran Church of America. A majority of the board of directors and the chief administrator of the hospital must be communicant members of the Lutheran Church of America. The chief administrator must report the hospital's operation annually to the annual convention of the Central States Synod. In the event of dissolution of Kansas City Lutheran, its property and funds are to be distributed to the West Central Conference of the Augustana Evangelical Lutheran Church or its successor, the Central States Synod, or its successor. The Lutheran Church of America is not a part of the Roman Catholic Church, the Old Catholic Church, or the Western Church, and does not recognize the Pope as its spiritual or administrative head.

St. Luke's Hospital is affiliated with the Protestant Episcopal Church in the United States of America, and particularly with the Diocese of West Missouri. All mem-

bers of its board of directors are members of the Protestant Episcopal Church in the United States of America. The Bishop of the Diocese of West Missouri is the chairman of the board of directors.

The court, pursuant to findings of fact and conclusions of law, ordered, adjudged and decreed:

"That the words 'Protestant Christian Hospital' as used in the Last Will and Testament of Homer McWilliams and the First Codicil thereto are construed to mean those hospitals that have some special relationship to and at least partial control by a Protestant Christian church.

"That the words 'Protestant Christian' as used in said Will and Codicil thereto are not indefinite, and the class of hospitals intended can be determined.

"That the selection of beneficiaries of the trust according to the provisions of said Will and Codicil thereto will not result in unlawful discrimination based on race or religion and is lawful.

"That the Baptist Memorial Hospital, the Lutheran Home and Hospital, St. Luke's Hospital and the Independence Sanitarium all qualify as proper beneficiaries under the Will of Homer McWilliams and the First Codicil thereto, and none of the other defendant hospitals do so qualify."

Appellant hospitals, the Lakeside Group, joined by appellant Martin Luther King, Jr. Memorial Hospital, contend the court erred:

I. In ruling respondent hospitals to be "Protestant Christian," because (1) the phrase "Protestant Christian" is so vague and uncertain that its meaning and effect cannot be defined or determined, and (2) even if its meaning can be determined there are no "Protestant Christian" hospitals in Jackson County and, as a consequence, "Protestant Christian" should be stricken from the trust;

II and V. In enforcing the trust's "racial and religious restrictions" for the rea-

son such judicial action violates the United States Constitution, Amendments I and XIV, and Missouri Constitution, Article 1, Sections 2, 5, 7, and 10, by implicating the State of Missouri in unlawful discrimination;

III. In enforcing the trust's "discriminatory" provisions when it is so related to an inherently public aspect of community life as to be governed by the proscription of the United States Constitution, Amendment XIV, as demonstrated by (A) the public charitable nature of the trust; (B) the public nature of the beneficiaries and the functions they serve, and (C) the quasi-public nature of the trustee, a national banking agency and instrumentality of the federal government;

IV. In qualifying respondent hospitals and in refusing to qualify appellant hospitals as trust beneficiaries based on religious doctrine forbidden by United States Constitution, Amendments I and XIV;

VI. In refusing to apply the doctrine of *cy pres* so as to strike the trust's "unlawful racial and religious restrictions, for the reason that the trust * * * exhibits a general charitable intent to benefit all non-profit, non-governmental hospitals in Jackson County, Missouri, and all patients therein."

Appellants known and unknown heirs of the testator assert:

I. Certain "basic legal requirements of a valid public charitable trust, viz., (A) it must conform to existing law to be valid; (B) testator's expressed and unambiguous intent governs unless contrary to law; (C) the main object and purpose of the charity cannot be changed; (D) a purported trust void on its face or illegal or impossible of performance is a nullity; (E) where the heirs of the donor no longer have any lawful interest in the trust assets, courts have greater freedom in determining the proper use of such funds, to concede:

II. The dominant specific and limited charitable purpose of testator was to create

a public charitable trust to secure "the greatest measure of hospital service and care to deserving poor and unfortunate people of the class aforesaid," to wit, "Sick and infirm patients in said hospitals (Protestant Christian Hospitals) born of white parents in the United States of America"; but to assert the court erred:

III. In entering a judgment which placed the State in a position of sponsoring and promoting racial and religious discrimination and making it the duty of the trustee and state officers to enforce the trust in direct violation of constitutional provisions;

IV. In ruling that its construction of the trust would not result in unlawful discrimination based on race;

V. In its construction because it advances religion in a partisan way by giving aid and encouragement to "one Christian Protestant Religion" to the exclusion of all other religions; all to conclude:

VI. That the intent of this trust was to aid a special kind of charity in violation of constitutional provisions, rendering the instrument illegal and void, thereby foreclosing resort to any auxiliary rules of construction such as *cy pres* or deviation, all to conclude that the purported trust failed leaving the trust *res* to pass to the testator's heirs.

Appellant Attorney General contends the court erred:

I. In determining that the trust will not result in unlawful discrimination based on race for the reason that under the "sifting facts and circumstances test," Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), there exists the requisite state action, in that the creation, administration, and enforcement of the charitable trust, necessitates involvement of the State through its statutes, elected officials and courts, and requires the exercise of powers possessed by the State, thereby subjecting any action

thereunder to the constitutional guarantee of equal protection of law under the United States Constitution, Amendment XIV, and therefore any racial limitation should be declared null and void and stricken from the trust, by virtue of testator's general charitable intent.

Under II, the Attorney General is neutral on the declaration that certain hospitals, the St. Luke's Group, are Protestant Christian Hospitals, but asserts jurisdiction in the court to determine if the phrase "Protestant Christian Hospitals" is vague and unenforceable without infringing on constitutional provisions for the reason that the subject of controversy is a will which establishes a charitable trust, in order to contend the court erred:

III. In failing to apply the doctrine of deviation or of *cy pres* to benefit all defendant hospitals.

Appellant Attorney General contends also, with respect to the judgment awarding plaintiff's attorneys' fees, that the court erred in the fee allowed to plaintiff's attorneys asserting it was excessive and unreasonable.

The problem here is the construction of the quoted provisions of Article XV of the will of Mr. McWilliams; and there are many cases replete with the familiar rules governing resolution of construction problems.

■ The object is to ascertain the testator's intention. If the intention is plain and unambiguous, such intention must govern, provided it is not contrary to law. If the will contains plain and unambiguous language, courts give effect thereto, and have no authority to do otherwise on the ground that provisions of the instrument are not in harmony with the trend of the times. First National Bank of Kansas City v. Waldron, 406 S.W.2d 56, 58, 59 (Mo.1966). The function of the court is to construe the will as written by the testator and not to make or rewrite one for the testator under the guise of construction.

Burrier v. Jones, 338 Mo. 679, 92 S.W.2d 885, 887 [1] (banc 1936). The testator is presumed to know and intend the legal effect of the language he employs in his will, First National Bank of Kansas City v. Hyde, 363 S.W.2d 647, 653 [8] (Mo.1962); the courts give his words their plain and ordinary meaning, Cox v. Jones, 229 Mo. 53, 129 S.W. 495, 498 (1910), and take judicial notice of those meanings, City of St. Charles ex rel. Palmer v. Schulte, 305 Mo. 124, 264 S.W. 654, 655 [2] (1924). Where a charitable trust is in issue, it is considered that charitable gifts and trusts are favorites of the law and will be construed as valid when possible by applying the most liberal rules of which the nature of the case admits, and are often upheld where a private trust would fail. Burrier v. Jones, supra, 338 Mo. 679, 92 S.W.2d 1. c. 887 [7]; Ervin v. Davis, 355 Mo. 951, 199 S.W.2d 366, 368 [2] (1947).

It is not questioned that the will of Mr. McWilliams created a charitable trust. Suffice to say that his trust meets the definition of a charitable trust in Restatement of Trusts 2d, Section 348, page 210, viz., " * * * a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." With respect to the charitable purposes of Mr. McWilliams, see Taylor v. Baldwin, 362 Mo. 1224, 247 S.W.2d 741, 749 [2] (banc 1952), and see, generally, Voelker v. St. Louis Mercantile Library Ass'n, 359 S.W.2d 689, 693–694 [4] (Mo.1962); Buchanan v. Kennard, 234 Mo. 117, 136 S.W. 415, 421–422 [8, 9] (Mo.1911).

There are two identifiable classes of beneficiaries designated by Mr. McWilliams to which his trustee, in its discretion, is empowered to distribute the income from his trust estate. First is the class of nonprofit Protestant Christian Hospitals located in Jackson County, Missouri; second is the class of sick and infirm patients in said hospitals, born of white parents in the United States of America.

The designation of the first class is unambiguous and is determinable irrespective of the expert testimony of Dr. Ordway and Dr. Bangs which is consistent with and supports such determination.

In Conway v. Third Nat. Bank & Trust Co. of Camden, 118 N.J.Eq. 61, 177 A. 113 (N.J.1935), the trust was asserted to be indefinite, uncertain, and impossible of execution where the testator directed his trustees to select as his beneficiaries children with Christian antecedents. The court in upholding the designation of such a class, said, "It is hardly necessary to say that a Christian is one who believes or professes or is assumed to believe in Jesus Christ and the truth as taught by Him * * *." 177 A. 1. c. 116. Black's Law Dictionary, Rev. 4th Ed. (1968), defines "Christian" as "pertaining to Jesus Christ or the religion founded by him; professing Christianity. As a noun it signifies one who accepts and professes to live by the doctrines and principles of the Christian religion; it does not include Mohammedans, Jews, pagans, or infidels * * *." See also 76 C.J.S. Religious Societies, § 1, p. 736.

76 C.J.S., supra, page 741, defines "Protestant" as "A Christian who protests against the doctrines and practices of the Roman Catholic Church; a general term comprehending all those who, professing Christianity, yet are not in the communion of the church of Rome; a collective name for a large class of Christian denominations, and embracing all such denominations, except the Roman Catholic and Eastern Churches." Black, supra, defines "Protestants" as "Those who adhered to the doctrine of Luther; so called because, in 1529, they protested against a decree of the emperor Charles V. and of the diet of Spires, and declared that they appealed to a general council. The name is now applied indiscriminately to all the sects, of whatever denomination, who have seceded from the Church of Rome." See also Nich-

olas v. Evangelical Deaconess Home and Hospital, 281 Mo. 182, 219 S.W. 643, 646 (1920).

In short, "Protestant Christian" is not ambiguous. Both terms have an ascertainable meaning; and in common and familiar usage denote a non-Catholic Christian religious body. When the non-Catholic Protestant Christian entity is a hospital, as in the McWilliams trust, it reasonably means, as found by the trial court and applied to St. Luke's, Trinity Lutheran, Baptist Memorial, and Independence Hospitals, a hospital that has some relationship to and control by a Protestant Christian Church, and when such bodies are selected in the trustee's discretion, such class becomes fixed and definite. Epperly v. Mercantile Trust & S. Bank of Quincy, Ill., 415 S.W. 2d 819, 821, 822 (Mo.1967); Yeager v. Johns, 484 S.W.2d 211 (Mo.1972).

It has been recognized in several instances that secular institutions such as colleges and hospitals are properly operated under the "control," "auspices," or "management" of religious entities. See, e. g., In re Estate of Hall, 193 So.2d 587 (Miss.1967); State ex rel. Morris v. Board of Trustees of Westminster College, 175 Mo. 52, 74 S.W. 990 (1903); State ex rel. Waller v. Trustees of William Jewell College, 234 Mo. 299, 136 S.W. 397 (1911); Farm & Home Savings & Loan Ass'n v. Armstrong, 337 Mo. 349, 85 S.W.2d 461 (banc 1935); Bradfield v. Roberts, 175 U. S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899); Speer v. Colbert, 200 U.S. 130, 26 S.Ct. 201, 50 L.Ed. 403 (1906). In such instances, the institutions may be creatures of the governments under which they are organized, yet they are commonly recognized and held out to be "sectarian" institutions with emphasis on the particular sect involved.

The argument of appellant hospitals, the Lakeside Group, that in order to classify a hospital as "Protestant Christian" it must be one organized by Protestant Christians, operated by Protestant Christians for the sole and exclusive benefit of Protestant Christians, begs the true question under the foregoing authorities and under the evidence in this case that the four respondent hospitals, the St. Luke's Group, are Protestant Christian hospitals serving and offering facilities to the public, sectarians and nonsectarians, and patients of all descriptions alike.

It should be noted also that the court's finding in this respect does not preclude hospitals other than the respondent St. Luke's Group from qualifying as beneficiaries of this trust in the future upon a showing they are Protestant Christian hospitals operated on a nonprofit basis in Jackson County. None of the other hospital defendants make any claim that it has any relationship to or control by a Protestant Christian church. Each of them claims only that the limitation of beneficiaries to "Protestant Christian hospitals" is illegal and should be stricken.

The designation of the second group of beneficiaries is also unambiguous and determinable.

The bequest for the benefit of "sick and infirm patients" in specific hospitals is sufficiently definite for a charitable trust. Buchanan v. Kennard, supra. The same is true of the designation "born of white parents in the United States of America." See e. g., Olivas v. The Board of National Missions of Presbyterian Church, 1 Ariz. App. 543, 405 P.2d 481 (1965), sustaining a trust "for homesite for Yaqui Indians"; In re Estate of Hall, supra, clarified 195 So. 2d 94, modified 197 So.2d 235, sustaining a trust to "Christian (church school—any denomination but prefer a Methodist College) education of poor boys and girls as long as world stands"; Allaun v. First & Merchants Nat. Bank of Richmond, 190 Va. 104, 56 S.E.2d 83 (1949), recognizing validity of a trust for the "white poor of Powhatan County"; Bronson v. Strouse, 57 Conn. 147, 17 A. 699 (1889), upholding validity of a trust to pay interest to a "poor, deserving, Jewish family residing in

the city of New Haven"; Beardsley v. Selectmen of Bridgeport, 53 Conn. 489, 3 A. 557 (1886), validating a trust "for the special benefit of the worthy, deserving, poor, white, American, Protestant, Democratic widows and orphans residing in the town of Bridgeport, Connecticut."

Appellants' charge that administration of this trust as now construed will result in both religious and racial discrimination in violation of United States Constitution, Amendments I and XIV, stems from the statement in 25 A.L.R.3rd 736, 739 (1969):

"Under the more recent United States Supreme Court decisions, a charitable gift which is of such a nature that it will tend to carry out a function normally regarded as public in nature, or will require for its administration some governmental act, either in the way of enabling legislation or necessary governmental administration, will constitute a violation of the rights afforded by the Fourteenth Amendment * * * if the beneficiaries thereof are limited or defined in terms including the race or religion of an otherwise eligible beneficiary.

"In those cases where a gift of this nature is not enforced pursuant to the exclusion under consideration, either because the gift is held void under general considerations, as being too uncertain in its selection of beneficiaries or as involving proscribed state action, or because of the refusal of the trustee to take the gift under the conditions imposed, the courts have evidenced a desire to effect the general purposes of the gift by deleting the racial or religious exclusion, rather than to hold the gift void in its entirety,[2] although in a few cases this type of gift has been held to revert to the grantor or his heirs." [3]

Appellants suggest that where forbidden invidious discrimination exists in a charitable trust, four theories have been advanced

in the search for existence of "proscribed state action" which renders null and void a discriminatory provision in the trust instrument. These are characterized as the "public arena" theory found in Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L. Ed.2d 373 (1966); the "state function" theory employed in the so-called "white primary cases," e. g., Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); the "state property" theory, e. g., Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962); and the "sifting facts and weighing circumstances" theory of Burton v. Wilmington Parking Authority, supra. See also the Girard Trust cases, particularly Commonwealth of Pennsylvania v. Brown, 392 F.2d 120 (3rd Cir. 1968); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1968); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L. Ed. 1586 (1953); Bank of Delaware v. Buckson, 255 A.2d 710 (Del.1969); Milford Trust Co. v. Stabler, 301 A.2d 534 (Del.1973); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4 Cir. 1963); Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964); Connecticut Bank & T. Co. v. Johnson Memorial Hospital, 30 Conn.Sup. 1, 294 A.2d 586 (1972), involving discrimination based upon race. Similar cases involve discrimination based upon religion, e. g., Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Presbyterian Church v. Hull Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); State v. Madison, 240 Md. 265, 213 A.2d 880 (1965).

Appellants pose two questions to be answered in determining whether this trust contains restrictions which violate the Fourteenth Amendment: (1) Are its restrictions discriminatory? (2) If so, are they so purely private as to lie outside the scope of the Fourteenth Amendment?

---

2. The position taken by appellants Lakeside group and Attorney General seeking application of *cy pres* or deviation.

3. The position taken by appellants known and unknown heirs seeking reversion of the trust *res*.

On question (1), appellants assert that the trust's racial and religious discriminations are *per se* and under all circumstances discriminatory. They argue that state action is involved in the administration of this trust, asserting variously that: "Judicial action enforcing the trust's discriminatory provisions is 'state action'" under the cases, particularly the Civil Rights cases, Shelley v. Kraemer, Barrows v. Jackson, Evans v. Newton, Bank of Delaware v. Buckson, Milford Trust Co. v. Stabler, supra, and Hawaiian Trust Co. v. Caffaro, No. 26496, Circuit Court of the First Circuit of Hawaii (unpublished opinion); that the statutory right to make a will and to create a trust, the right to give it perpetual existence, to have it construed, to have trustee and accounting, the right to tax benefits, and the public nature of the trust, show the requisite "state action" to strike the discriminatory restrictions of the trust under the "sifting facts and weighing circumstances" test of Burton v. Wilmington Parking Authority, supra, and the performance of a "function of the state" as in Eaton v. Grubbs and Evans v. Newton, supra; that, absent these factors, the Fourteenth Amendment would be violated by administration of this trust due to the public charitable nature of the trust itself, the public function fulfilled by the hospital beneficiaries under Simkins v. Moses H. Cone Memorial Hospital, supra, and the public functions served by the trustee, a national banking association.

On question (1) respondents concede that racial discrimination will result from selection of only white patients as one class of beneficiaries of this trust; however, it is at most arguable whether racial discrimination will result *per se* from selection of only "Protestant Christian hospitals" as the other class of beneficiaries of this trust. See Bradfield v. Roberts, supra; Speer v. Colbert, supra; State ex rel. Morris v. Board of Trustees of Westminster College, supra; Wyatt v. Stillman Institute, 303 Mo. 94, 260 S.W. 73 (1923); Society of Helpers of Holy Souls v. Law, 267 Mo. 667, 186 S.W. 718 (1916).

On question (2), even if it be assumed that racial discrimination or religious discrimination, or both, be present, such discrimination in the administration of this trust is not illegal under the Fourteenth Amendment because "state action" is not involved.

 The Fourteenth Amendment provides that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." See also Missouri Constitution, Article 1, Sections 2, 5, 7, and 10. Appellants recognize, as they must, that this amendment does not prohibit racial and religious discrimination in private transactions unless "state action" is involved. "The Civil Rights cases * * * 'embedded in our constitutional law' the principle 'that the action inhibited by the first section [Equal Protection Clause] of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment exerts no shield against merely private conduct, however discriminatory or wrongful.' * * * Shelley v. Kraemer * * *. It was language in the opinion in the Civil Rights Cases * * * that phrased the broad test of state responsibility under the Fourteenth Amendment, predicting its consequences upon 'State action of every kind . . . which denies . . . the equal protection of the laws.' * * * some 75 years later, the same concept of state responsibility was interpreted as necessarily following upon 'state participation through any arrangement, management, funds or property.' Cooper v. Aaron, 358 U.S. 1, 4, 78 S.Ct. 1401, 1403, 3 L.Ed.2d 5 (1958). It is clear, as it always has been since the Civil Rights Cases * * * that 'Individ-

ual invasion of individual rights is not the subject-matter of the amendment,' * * * and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it." Burton v. Wilmington Parking Authority, supra, 365 U.S. 1. c. 721–722, 81 S.Ct. 860. Note also that in Evans v. Newton, supra, it was only because state action was required to carry out the terms of the will in question that its discriminatory provisions could not be enforced. Absent such required state action, such discrimination would not be illegal because "If a testator wanted to leave a school or center for the use of one race only and in no way implicated the State, * * * *arguendo* * * * no constitutional difficulty would be encountered." 382 U.S. 1. c. 300, 86 S.Ct. 489.

█ Under the facts of this case, "state action" was not involved in the creation of the trust, nor is it required to carry out its terms. Mr. McWilliams was a private individual, and the corpus of his trust derived solely from his private funds. The trustee is a privately owned bank and it selects beneficiaries in each class in an exercise of unlimited discretion. Nothing in the will limits the use of funds given to "Protestant Christian hospitals"; nothing prohibits or prevents such hospitals from using the money for any purpose within the purview of their charters, including rendering services and offering facilities without regard to race, religion or national origin, and they do perform these functions without discrimination. Once the trustee has exercised its discretion as to which of the Protestant Christian hospitals provides the greatest measure of services to the poor and deserving of the class described and distributions are made to such hospitals, no provision of the will restricts the use of the funds by the hospitals. Similarly, the trustee has the discretion to select deserving individuals of the class of "sick and infirm patients in said hospitals

born of white parents in the United States * * *." No public body is involved in the latter selection because payments to any such beneficiaries would flow directly from the trustee to them.

Such circumstances in this case distinguish this case from those in which the trustee is a governmental body. See e. g., Evans v. Newton, supra; Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970).

█ Nor has the court in construing this trust engaged in "sponsoring," "promoting," or "enforcing" discrimination, as in Shelley v. Kraemer, supra, and Barrows v. Jackson, supra, where the court was asked to rule the legality of a restrictive covenant prohibiting real estate sales to blacks, and to implement the holding by affirmative judicial action such as ouster from possession of the black owner or granting a money judgment and execution.

By way of contrast, the court was asked to determine only the hospitals intended by the testator to be identified. The court was not asked to direct the trustee nor to execute the trust, nor to choose beneficiaries. It was asked only to construe a trust provision to determine a testator's intent. Cf. Bank of Delaware v. Buckson and Milford Trust Co. v. Stabler, supra.

If appellants' arguments were sustained, then no transfer of property by will to a religious institution or to a person of a designated race could be valid if a construction of the will's provisions became necessary. Such is not an indicated result under the law. Evans v. Newton, supra. See also Moose Lodge No. 107 v. Irvin, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). See also discussion of "state action" as to bring into play the prohibition of the Fourteenth Amendment in Guillory v. Administrators of Tulane University, 212 F.Supp. 674, 683–687 [6] (E.D.La. 1962), and In re Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844, 851–852 (1958).

Neither is "state action" present simply because a public trust is involved. Voelker v. St. Louis Mercantile Library Ass'n, supra, 359 S.W.2d 1. c. 693–694; Buchanan v. Kennard, supra, 136 S.W. 1. c. 421–422; nor is "state action" involved because of the public nature of the hospital beneficiaries and their regulation or partial funding by the government. Simkins v. Moses H. Cone Memorial Hospital, supra; Ward v. St. Anthony Hospital, 476 F.2d 671, 675 (10th Cir. 1973); Stanturf v. Sipes, 224 F.Supp. 883 (W.D.Mo.1963), aff. 335 F.2d 224 (8th Cir. 1964). Nor is the trustee bank engaging in significant encouragement of discrimination as to constitute a "state action." Kruger v. Wells Fargo Bank, 11 Cal.3d 352, 113 Cal.Rptr. 449, 521 P.2d 441 (1974). If it were so, then no national bank could act as a executor or trustee where the devise was to a church or to a racially determined person.

The last word on the subject of "state action" demonstrates the absence of "state action" in this case. Under Jackson v. Metropolitan Edison Co., 419 U. S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), a utility's discontinuance of electric service for nonpayment of bills is not action under color of state law which must meet due process standards. The court observed that despite extensive and detailed state regulation of the utility, there is not a sufficiently close *nexus* between the state and the utility's act to require treatment as state action. The court concluded that neither the utility's monopoly status nor its performance of an important public service warranted holding otherwise, i. e., the State never directed nor authorized the challenged practice, and the court could not find the "symbiotic relationship" that warranted a state action finding in Burton v. Wilmington Parking Authority, supra.

Appellants charge also that the court's construction involves factors of religious doctrine and results in aid and encouragement to one Protestant Christian religion to the exclusion of all others.

Suffice to say that this decision does not spring from resolution of ecclesiastical or religious doctrinal issues. See Watson v. Jones, 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871); Presbyterian Church v. Hull Church, supra, 393 U.S. 1. c. 451. The issue here resolved was what hospitals and persons Homer McWilliams intended to identify, and was not whether any of such hospitals was, in itself, a "Protestant Christian" entity. There was no contest over rights regulated by ecclesiastical law or religious doctrine; and there is no contention that any party to this suit has discriminated against any patient on account of his religion.

With the case in this posture, there is no room for application of *cy pres* or deviation and they need not be discussed. Neither is there any failure of the trust to cause the trust *res* to pass to testator's heirs.

There were twenty separate applications for attorneys' fees, supported by time and work sheets, oral testimony, and memoranda covering the criteria applicable to such allowances. Attorneys for appellant hospitals adduced expert testimony that a reasonable rate in Kansas City for services of the nature of those rendered by such attorneys was "at least" $50 per hour. Mr. Bush testified in support of his firm's application: that he was the senior member of his firm and had done about 95 per cent of his firm's work in this case, the remainder having been accomplished by his partner, Mr. Snapp; that he had no fee arrangement with the plaintiff trustee except his firm was to be paid a reasonable fee to be determined by the court, payable from the trust assets; that he had no way to receive a contingent fee as in the case of attorneys for the known heirs who, if successful, could receive several million dollars each in fees; that the court should consider all the criteria generally recognized as applicable to the problem of his fee, e. g., time and labor, novelty and difficulty of questions, the caliber of the attor-

neys representing his opposition, results obtained, amount involved both in dollars and responsibility, the one-time nature of the professional relationship, experience, reputation and ability of the lawyers performing services, whether the fee is fixed or contingent; that he had been with this case more than five years, over four and a half of which were in court; that he had not collected any fee; that he had at least $30,000 in office overhead attributable to the case; that he and his partner had over 1600 hours invested in the case; that the court should fix the fee at no less than that authorized by Section 473.153, RSMo 1969, V.A.M.S., for fees for executors or administrators in probate estates; that there is a difference between attorneys for the hospital defendants; that he was the lead attorney and was involved in acute tax matters and in six counts of the suit, whereas attorneys for the other parties were involved only in Count V; that he fell heir to all the mechanical work necessary to keep the litigation moving; that had he not been successful, the entire trust might have failed and devolved to the heirs and none of the hospitals or indigents intended to benefit from the trust would have realized any such benefit.

All applications were granted as prayed except for the prayer of the attorneys for the trustee. The fees for attorneys representing defendant hospitals were allowed on the time-rate basis suggested by their expert. The court was unable to accept the request of plaintiff's attorneys for an allowance of $234,000 for fees and expenses to the extent it was based on a percentage formula in the Probate Code. The ultimate allowance of $176,000 to plaintiff's attorneys, although approximately one fourth less than that prayed, is the only allowance in question.

■ Factors to be considered as guides in determining the reasonableness of such allowance include:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood * * * that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the area for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent." Rule 4–DR, 2–106. See also American Bar Association Code of Ethics.

■ It is recognized also that an attorney for a trustee in a will construction suit is entitled to be paid the full value of his services, while attorneys for claimants to the estate are entitled to be paid only for the value of their services to the estate. Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104 (1934); St. Louis Union Trust Co. v. Kaltenbach, 353 Mo. 1114, 186 S.W.2d 578 (1945); Lang v. Taussig, 194 S.W.2d 743 (Mo.App.1946).

In support of the judgment allowing attorneys' fees, and in particular of the allowance to plaintiff's attorneys, the trial court filed a memorandum opinion:

"This suit was commenced by the corporate trustee to obtain a construction of the trust provisions of the will. The Attorney General and all hospitals in Jackson County, Missouri, then licensed as such, were joined as defendants. By amendment two possible heirs at law of the testator were impleaded, as well as the unknown heirs. The appointed attorney for the unknown

heirs investigated other possible heirs, and two more intervened.

"Most of the parties have prayed the allowance of attorney's fees to be paid from the trust estate. Evidence has been adduced as to the particular services and their value and as to the ordinary and customary charge for such services. This Court must resolve the question of who is entitled to an allowance and the further question of what amount is reasonable and proper. * * *

"Those * * * who * * * seek allowances can be grouped in some instances. Before discussing them it is appropriate to make some comment.

"One of the cases cited is Mercantile Trust Company National Association v. Jaeger, 457 S.W.2d 727 (Mo. en banc 1970). The holding in that case is of minimal value here, for the issue was whether attorney fees should be allowed to the trustees where the litigated issue was the proper compensation of the trustees themselves.

"The opinions are, however, valuable for other reasons. First, they collate and discuss the controlling precedents. Second, they illustrate how widely seven trained and experienced minds can honestly differ. *Mercantile, supra,* at 733–734, 736, 743–746.

"The other case is City of St. Louis v. McAllister, 302 Mo. 152, 257 S.W. 425 (1924) * * *. There the general rule is announced at length. Allowances were made to heirs who intervened.

"To return to the applicants here, the most readily handled defendants are those who prevailed. They succeeded in obtaining a construction * * * which upholds the trust without modification or resort to the doctrine of *cy pres*. These are Trinity Lutheran Hospital, St. Luke's Hospital, Baptist Memorial and Independence Sanitarium.

"In general, the remaining hospital defendants did not seek the destruction of the trust but rather a construction of the trust provisions sufficiently broad so as to encompass them. Six of these, Lakeside, Jewish Memorial, Research, Kansas City College of Osteopathic Medicine, Northeast Osteopathic, and St. Mary's, aligned themselves together with a view toward minimizing duplication of work; * * *

"The eight mentioned together with Wheatley-Provident, Downtown, Plaza, St. Joseph, and Neurological hospitals participated actively in the trial * * * and made contributions. They do not have to be 'winners' to be allowed attorney fees from the trust estate. Trautz v. Lemp, 72 S.W.2d 104, 107 (Mo. en banc 1934).

"There has never been any question as to the propriety of an allowance to the attorney for the unknown heirs. The unknowns were joined in the hope that a final adjudication could be made, one binding on all concerned.

"How does this affect the heirs at law who were joined as defendants or who intervened when they learned of the litigation? The attorney for the unknown heirs performed the role of devil's advocate. For this he is to be compensated. Are the individual heirs less deserving of allowances? The named defendants were not mere volunteers, nor were the intervenors who responded to the invitation when the unknown heirs were summoned.

"The Court is not unaware of the 'no benefit, no fee' rule. Nor is the Court unmindful that the individuals were actuated by self-interest and that their attorneys would have been handsomely rewarded had they been successful. * * *

"The propriety of allowances to the individuals is not free from doubt. Mercantile Trust Company National Association v. Jaeger, *supra* and especially Judge Seiler's discussion of St. Louis Union Trust Company v. Kaltenbach, 353 Mo. 1114, 186 S. W.2d 578, in his dissenting opinion, 457 S. W.2d at 744–746.

"However, the nature of this case and the posture of the individual defendants caused them to contribute to the construction of the trust instrument and thereby a benefit to the trust estate. They should receive allowances.

"The amount of allowances should be governed by traditional considerations codified in Supreme Court Rule 4 and especially DR 2-106 of that rule. There is ample evidence in the record to enable the Court to take the listed factors into consideration as guides in determining the reasonableness of the fee allowances.

"No unusual problem is encountered until reaching the application of the trustee. The Court accepts the written application and supporting oral testimony of its counsel. The services have been outstanding, the problems complex. The amount involved is great, and the result obtained is that sought. The Court, however, is unable to accept a percentage formula derived from the Probate Code. Likes must be compared with likes, and there are too many differences between an allowance by the probate court in the administration of an estate and an allowance in an equity case such as the instant one. The factors have been balanced and a result reached considerably in excess of other allowances herein and considerably less than that prayed."

The foregoing memorandum has been quoted in near entirety because it demonstrates that the trial judge, the Honorable James C. Moore, appreciated the difficulties and differences of opinion inherent in the task of setting attorneys' fees, considered the evidence on the issue in detail, and considered and made application of the appropriate legal standards and criteria to the evidence in resolving the issue.

Judge Moore has been a lawyer in Kansas City, Missouri, since 1934, and a judge of the Circuit Court of Jackson County, Missouri, since 1963. Official Manual State of Missouri 1973–1974. Judge Moore, more than any person, was in position to judge the relative value of all legal services rendered in this case and those rendered by the attorneys for the trustee in particular. The judgment may not be disturbed unless clearly erroneous. Scott v. Home Mutual Telephone Co., 510 S.W.2d 793, 795 (Mo.App.1974). Such a demonstration is absent in this case. As observed in Donaldson v. Allen, 213 Mo. 293, 111 S.W. 1128, 1129 [1] (1908), " * * * the judge deciding the point presumptively knew the character of the services rendered in duration, zeal, and ability. He presumptively knew the value of them according to custom, place, and circumstance. * * * In this view of the matter, there is room for a most violent presumption that the trial court did not err in gauging the quantum of the fee." See also Sebree v. Rosen, 393 S.W.2d 590 (Mo.1965); Billinger v. Jost, 510 S.W.2d 57, 58 [1, 2] (Mo.App.1974).

Judgments on both the merits and in allowance of attorneys' fees affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.